2017 PA Super 227

| | |
|---|---|
| RAYMOND SEELS, ADMINISTRATOR OF THE ESTATE OF TERRI SEELS-DAVILA, DECEASED, AND RAYMOND SEELS, IN HIS OWN RIGHT,<br><br>Appellant<br><br>v.<br><br>TENET HEALTH SYSTEM HAHNEMANN, LLC, D/B/A HAHNEMANN UNIVERSITY HOSPITAL AND PHILADELPHIA HEALTH & EDUCATION CORPORATION AND DREXEL UNIVERSITY COLLEGE OF MEDICINE,<br><br>Appellees | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>No. 1838 EDA 2015 |

Appeal from the Judgment Entered July 22, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 00560 September Term, 2012

BEFORE: PANELLA, SHOGAN, and SOLANO, JJ.

OPINION BY SHOGAN, J.: **FILED JULY 18, 2017**

Appellant, Raymond Seels, administrator of the estate of Terri Seels-Davila ("Seels-Davila"), deceased, and Raymond Seels,[1] in his own right, appeal from the judgment entered on July 22, 2015, in favor of Tenet Health System Hahnemann, LLC, d/b/a Hahnemann University Hospital and Philadelphia Health & Education Corporation and Drexel University College of

---

[1] Appellant is Seels-Davila's father.

Medicine (collectively "Appellees") in this medical malpractice action. We affirm.

The trial court provided a thorough recitation of the relevant facts of this case, which is set forth below:

> In early 2010, 38-year-old Terri Seels-Davila ("Seels-Davila") and her husband Levi Davila were working in Managua, Nicaragua as Jehovah's Witnesses missionaries. During this time, Seels-Davila became pregnant and received prenatal care in Nicaragua for the first seven months of her pregnancy. N.T. 4/24/15 at 11. In early September 2010 she returned to her hometown of Philadelphia to ensure that "she was seen by the best health care in a first world country." Id. at 11, 16, 39-40, 61-63; N.T. 4/21/15 at 33. Adherents of the Jehovah's Witness faith refuse to accept blood transfusions and so, with the help of Appellant, who was her father and a retired licensed nurse and also a devout Jehovah's Witness, Seels-Davila chose Hahnemann University Hospital as the hospital where she would deliver her baby. N.T. 4/24/15 at 12-16.
>
> Hahnemann was one of the few regional medical facilities that engage in outreach to "Bloodless Medicine" patients, the term used for patients who, for various reasons, refuse blood transfusions. In order to assist these patients, Hahnemann had a "Bloodless Medicine Program" with three clerical staff who were Jehovah's Witnesses. See N.T. 4/23/15 at 154. These clerks were responsible for explaining the risks inherent in not receiving blood transfusions and alternative treatment methods if transfusions are refused, ensuring the bloodless patients' wishes were memorialized on blood transfusion refusal consent forms, and that this information was transmitted to and prominently displayed on the patient's medical chart and hospital wristbands upon admission.
>
> On November 19, 2010, Seels-Davila and her father met with Iris Jiminez, one of the clerks at Hahnemann's Center for Bloodless Medicine. N.T. 4/24/15 at 12-13, 41. After talking with Ms. Jiminez, Seels-Davila signed a form entitled "Hahnemann University Hospital Center for Bloodless Medicine and Surgery Medical Directive/Release" where she indicated the following:

I, Terri Elaine Seels-Davila ... request that no blood (whole blood, red cells, white cells, platelets and plasma) be administered to me during this hospitalization. I will accept the use of nonblood [sic] volume expanders (such as dextran, saline, or Ringer's solution or hetastarch) and other nonblood management.

Appellant's Motion in Limine to Preclude Appellees from Offering Testimony and/or Evidence of Informed Consent and/or Any Medical Release, Ex. A at 1 ("Consent MIL"). In addition to these restrictions, Seels-Davila further stated that she did not consent to the use of hemodilution (i.e. blood storage, even of her own blood). Id. This administrative process took approximately fifteen minutes and did not involve any of Hahnemann's doctors, nurses, or other employees besides Ms. Jiminez. N.T. 4/24/15 at 13-14.

On Wednesday November 24, 2010, Seels-Davila went into labor and was admitted to Hahnemann at approximately 4:30 PM. Id. at 16, 44. She arrived with her cervix dilated to "approximately four centimeters," but quickly began to experience difficulties with her labor. N.T. 4/23/15 at 13. Dr. Minda Green, who was the attending obstetrician/gynecologist at the time of Seels-Davila's admission, insisted that Seels-Davila talk with the Center's staff to again review her treatment choices. N.T. 4/21/15 at 65-66, 69-72. After a conversation with these advocates and Dr. Brandi Musselman, another Hahnemann obstetrician, Seels-Davila signed a form at 6:25 PM entitled "Consent for Refusal for Transfusion of Blood and/or Human Source Products," ("Consent for Refusal") in which she again expressly indicated that she refused to accept blood transfusions as part of her treatment at Hahnemann, stating that:

I [Seels-Davila] understand from Dr. Musselman that it may be advisable for me to receive a transfusion of blood, blood components or other human source products. I understand the circumstances that might make a transfusion necessary and the benefits of such a transfusion to my health. I have been given the attached information sheet, which describes the risks, benefits, and alternatives to the transfusion of blood and/or human source products ... I refuse all blood components and human source products.[]

- 3 -

Consent MIL, Ex. D at 1; N.T. 4/21/15 at 69-70; N.T. 4/24/15 at 44; *see* N.T. 4/27/15 at 93-97 (Dr. Musselman testifying regarding her pre-cesarean section discussions with Seels-Davila, as well as Seels-Davila signing the Consent for Refusal). Seels-Davila also indicated on this form that she consented to the use of a cell saver machine, if necessary, for intra-operative blood salvage and, below the signature line, **handwrote** "I am one of Jehovah's Witnesses. No blood."

Consent MIL, Ex.Eat 1. According to Dr. Musselman, Seels-Davila specifically told her that she "*would rather die than receive blood products*." N.T. 4/27/15 at 97. At 6:31 PM, Seels-Davila also signed a form entitled "Consent for Delivery," checking off boxes indicating that she consented to giving birth via "vaginal delivery" or "cesarean section." Consent MIL, Ex. C at 1.

After over 12 hours of labor, Seels-Davila developed a fever and her unborn child's heart rate spiked. N.T. 4/21/15 at 83-84; N.T. 4/23/15 at 13-14. Accordingly, Dr. Green decided to perform a cesarean section at approximately 7:00 AM on Thursday, November 25, 2010. N.T. 4/21/15 at 84-85; N.T. 4/23/15 at 13-14. Seels-Davila's child was successfully delivered at 7:16 AM, and her uterus was then exteriorized. N.T. 4/21/15 at 103. Dr. Green and Dr. Asata Mehta, a third-year resident, "tagged" the corners of Seels-Davila's uterine incision, cleaned the sides of her abdomen and pelvis with sponges to remove excess blood, and inspected the incision multiple times to ensure that it was not bleeding. Id. at 104-106. Drs. Green and Mehta then cut these "tags," and proceeded to suture close each of the abdominal wall layers that had been cut during the cesarean section, checking for bleeding throughout the whole process. Id. at 105-106.

Following surgery, Seels-Davila was transferred to the Post-Anesthesia Care Unit ("PACU") at approximately 8:20 AM. N.T. 4/23/15 at 16. Her vital signs were checked, including her blood pressure which was recorded as 100/48. Id. At 8:30 AM, Seels-Davila's blood pressure was taken again, this time registering as 97/50. Id.; N.T. 4/21/15 at 136. Additional readings were taken at 8:40 AM and 8:45 AM, at which points Seels-Davila's blood pressure was respectively 102/55 and 108/53. N.T. 4/21/15 at 136. At 9:00 AM, her blood pressure was measured as being 89/62. N.T. 4/21/15 at 136-37; N.T. 4/23/15 at 16-18. At 9:15 AM, Seels-Davila's blood pressure fell

significantly to 67/32, at which point the anesthesia unit was notified. N.T. 4/23/15 at 18-19. At 9:20 AM, PACU staffers and Dr. Saninuj Malayaman, an anesthesiologist, arrived at her bedside. N.T. 4/22/15 at 6; N.T. 4/23/15 at 29.

At 9:30 AM, Dr. Yusef Morant-Wade, a third-year resident, called Dr. Kelli Daniels, who had taken over for Dr. Green as attending obstetrician at around 8:30 AM that morning. N.T. 4/21/15 at 129-131; N.T. 4/23/15 at 95. Dr. Morant-Wade advised Dr. Daniels that Seels-Davila's blood pressure had precipitously dropped, but that she was not exhibiting any other telltale signs of internal bleeding such as shortness of breath, palpitations, pain, or a distended stomach. N.T. 4/22/15 at 18, 21; N.T. 4/23/15 at 31-32. Dr. Daniels responded by ordering a complete blood count ("CBC") test, in order to see if Seels-Davila's hemoglobin levels were dropping, and to determine whether she was anemic or had low levels of oxygen-carrying red blood cells. N.T. 4/21/15 at 131, 158-59. Based on the information provided by Dr. Morant-Wade, Dr. Daniels surmised that the likely cause of Seels-Davila's abnormally low blood pressure was either blood loss during the C-section, the anesthesia given during her cesarean section, or by Pitocin, a medication that was given to Seels-Davila to help her uterus contract after her cesarean section. N.T. 4/21/15 at 138; N.T. 4/22/15 at 12, 22. At 9:35 AM, Dr. Malayaman administered 10 milligrams of Ephedrine to Seels-Davila, and confirmed that Seels-Davila was a Jehovah's Witness who would not consent to the use of blood products as part of her treatment. N.T. 4/23/15 at 29. Within minutes, the Ephedrine boosted Seels-Davila's blood pressure, which registered 91/48 at 9:40 AM. Id. Despite this improvement, PACU staffers began to suspect that Seels-Davila was suffering from internal bleeding, documenting their collective concerns at 9:42 AM through a note on her medical records. N.T. 4/23/15 at 35. At 10:00 AM, Seels-Davila's blood pressure had fallen to a "dangerously low" level of 64/39, with a subsequent reading five minutes later that showed her blood pressure as 67/25. N.T. 4/23/15 at 31, 32. At 10:05 AM, a nurse attempted to draw blood from Seels-Davila for use in the CBC test, but was unable to do so and had to call for assistance. Id. at 96-97; see Appellant's Trial Exhibit P-7 at 5 ("1005 Unable to obtain blood for CBC-CL Robbin RN called for assist."). Seels-Davila was still alert and oriented at 10:10 AM, and asked for ice chips, but shortly thereafter she began to slur her speech. N.T. 4/23/15 at 33; Appellant's Trial Exhibit P-7 at 5. At 10:15 AM, a

nurse successfully took Seels-Davila's blood for the CBC test. N.T. 4/23/15 at 96; see Appellant's Exhibit P-7 at 5 ("1015 ... CL Robbins drawing CBC.").

Dr. Daniels was then called to Seels-Davila's bedside and, along with PACU staffers, began to administer large volumes of intravenous fluids to Seels-Davila. N.T. 4/23/15 at 34-35; Appellant's Trial Exhibit P-7 at 5. This seemed to improve Seels-Davila's condition, as her speech pattern returned to normal, and her blood-oxygen saturation levels reached 100%. N.T. 4/23/15 at 35. Dr. Daniels performed a "head to toe" bedside examination of Seels-Davila, determining that there were still no obvious signs of internal bleeding. N.T. 4/22/15 at 22-24. By 10:46 AM, Dr. Daniels was joined at Seels-Davila's bedside by Dr. Asemato (the chief resident) and Dr. Malayaman, to observe and monitor their patient. N.T. 4/23/15 at 36. At 10:59 AM, the results of the CBC test came back and showed that Seels-Davila's condition was deteriorating, as her hemoglobin count had dropped precipitously from 14.1 at admission, to 7.8 at the time that the test had been administered. N.T. 4/21/15 at 146-47; N.T. 4/23/15 at 36. In addition, during this time frame (i.e. between 10:00 AM and 11:00 AM), Dr. Daniels performed a bedside sonogram that revealed the presence of extraneous fluid in Seels-Davila's abdomen, which Dr. Daniels suspected was blood. N.T. 4/21/15 at 140; N.T. 4/22/15 at 23; N.T. 4/23/15 at 37. Accordingly, Dr. Daniels made the decision to bring Seels-Davila back to the operating room for an exploratory laparotomy, in order to determine the exact cause of Seels-Davila's distress. N.T. 4/23/15 at 38.

Dr. Daniels reviewed Seels-Davila's admission paperwork prior to surgery, noting that, as mentioned supra, Seels-Davila had authorized the use of a cell saver machine. Dr. Daniels discussed this with her patient while trying, unsuccessfully, to convince Seels-Davila that she should consent to a blood transfusion. However, according to Dr. Daniels, Seels-Davila "was adamant about not receiving blood and was instead given one liter of albumin" before her transfer to surgery. N.T. 4/21/15 at 159-61; see also N.T. 4/22/15 at 30 (Dr. Daniels testified that Seels-Davila "said that she was a minister in the faith i.e. Jehovah's Witnesses and that she was okay with whatever happened."); N.T. 4/27/15 at 7-10 (Nurse Flanagan testifying that, while enroute to the operating room, she unsuccessfully attempted to get Seels-Davila to authorize the use of blood

transfusions if such treatment was deemed necessary). At approximately 11:00 AM, Dr. Daniels called the operating room and informed the staff that she would need a cell saver machine for use during the laparotomy. N.T. 4/21/15 at 159-60. This was an essential step, as cell savers are normally not used in emergency surgical procedures and require additional time to set-up. Id. at 73-75. These machines can only be fully operated by a perfusionist, who is called in from offsite and usually takes around 30 minutes to arrive at the hospital. Id.; *cf.* Amron Deposition at 66 (stating that Hahnemann contracts with "an outside service that just about every hospital in the city uses as their source for perfusionists ... Probably 80 percent of the hospitals in the city are using the same company so--it may be 70 percent but it's largely one company.")

Nurse Wayne Rivers brought the cell saver to the operating room, connected a suction catheter to the machine, put in anticoagulants, "and did whatever else was necessary to set the cell saver up." N.T. 4/21/15 at 148-49. The emergency laparotomy procedure began at 11:33 AM and the cell saver machine was switched on and began collecting Seels-Davila's blood. At approximately 12:00 PM, the perfusionist joined Dr. Daniels in the operating room and began essentially cleaning the blood for re-infusion into the patient. N.T. 4/21/15 at 148-51, 156-57, 161.

During the exploratory laparotomy surgery, Dr. Daniels discovered that Seels-Davila was bleeding internally, and used the cell saver in an attempt to salvage the approximately 2,500 to 3,000 CCs of blood [that] had pooled in her abdomen. This effort was complicated by the fact that a good portion had already become clotted. N.T. 4/21/15 at 145; N.T. 4/22/15 at 36-37; N.T. 4/23/15 at 38. According to Dr. Daniels, Dr. Morant-Wade was "continuously trying to break up the clots to suction the blood to put it into the cell saver filtration canister," which was "a difficult thing to do because it's almost like suctioning Jell-0 through ... a suction tube." N.T. 4/22/15 at 36. As a result of these efforts, the cell-saver machine was able to process approximately 1800 CCs of this pooled blood and, after being filtered and processed, 626 CCs were ultimately transfused to Seels-Davila in the form of packed red blood cells. N.T. 4/23/15 at 118, 126-27.

While it was clear that Seels-Davila was bleeding internally, the source of the bleeding was not readily apparent. Dr. Daniels had no choice but to extend the incision by cutting upward, in an "upside-down T fashion," to get a better visual of the uterus. N.T. 4/21/15 at 144. After properly doing so, Dr. Daniels discovered that Seels-Davila had an extremely rare uterine anomaly, in which her uterus had a small extra horn or "nub" on its side, outside of where her child had been gestating. Id. This additional horn exhibited a two centimeter-long cut, which was apparently the source of Seels-Davila's internal bleeding. Id. at 144-45, 161. The manner in which this cut had occurred was never fully resolved by the physicians or the evidence offered at trial. Whether Dr. Green was negligent in the performance of the C-section by cutting this uterine horn was one of the key issues before the jury.

Dr. Daniels repaired the cut of Seels-Davila's anomalous horn, put a compression stitch on the right uterine artery (i.e. the artery which provides the bulk of the uterine blood supply), and tied off the uterine ovarian ligament (the other major source of blood for the uterus) to slow down the bleeding. N.T. 4/21/15 at 144-45. Dr. Daniels also used a B-lynch compression suture, wrapping it around Seels-Davila's uterus in an effort "to kind of shrink the uterus down because it wasn't contracting on its own." N.T. 4/21/15 at 145; *see* N.T. 4/22/15 at 40-41 (**Dr. Daniels:** "Because her uterus wasn't contracting down, we gave her medications. We gave her Hemabate and Methergine, which both, again, make the muscles contract, and that didn't work, so we did a compression suture called a B-lynch suture."). During this surgery, Dr. Daniels also installed a "JP drain" in Seels-Davila's abdominal cavity, in order to permit blood and other fluids to evacuate, and to allow for monitoring of activity within the cavity without additional exploratory surgery. N.T. 4/21/15 at 165.

After the surgery, Seels-Davila was taken down to the surgical intensive care unit. N.T. 4/21/15 at 165; N.T. 4/27/15 at 54. At some point between 2:00 p.m. and 4:00 p.m., Dr. Daniels noticed that more blood was emptying from Seels-Davila's JP drain, and decided to take her back into the operating room for the purpose of removing her uterus. N.T. 4/21/15 at 165. Dr. Daniels believed that the loss of so much blood had, in effect, caused Seels-Davila's remaining blood to be depleted of its clotting factors, and that this additional surgery was

necessary under the circumstances, given that Dr. Daniels was prohibited from halting the internal bleeding through the transfusion of fresh blood. N.T. 4/22/15 at 43-44, 49-50. Accordingly, Dr. Daniels performed a supracervical hysterectomy, a procedure through which the uterus is removed while the cervix is left intact and in place within the patient's body. N.T. 4/21/15 at 166. Seels-Davila lost roughly 300 CCs of blood during this surgery and, all told, lost an estimated five liters of blood during the three surgeries. Id. at 167-68. The blood that was processed through the cell saver and returned to her did not help with her clotting issues, however, as the filtration process strips away any platelets or other components that would assist with coagulation. *See* N.T. 4/23/15 at 127.

Certain that Seels-Davila's very survival hinged on the ability to give her blood transfusions, Hahnemann doctors then sought in vain to get authorization from her family members to do such a procedure, despite Seels-Davila's firm and repeated opposition to blood transfusions because of her faith. Dr. Daniels repeatedly asked Seels-Davila's parents over the following two days to override their daughter's advance directive but, each time the topic was broached, they rebuffed Dr. Daniels' entreaties. N.T. 4/22/15 at 43-49; N.T. 4/28/15 at 26. Out of desperation, Dr. Owen Montgomery, chairman of Hahnemann's OB/GYN department, called [Seels] at 4:00 AM on Saturday, November 27, 2010, telling him that: "I know and I respect your daughter's wishes. And I understand the family's wishes. And I'm calling you not as her doctor, but as a father. I have three daughters ... I'm calling you father to father. And ... I respect your wishes. But. .. if there is ever going to be a time that your family changes their minds, it has to be now." N.T. 4/28/15 at 25. Though Dr. Montgomery "wasn't even sure at that point whether just giving the ... transfusion would actually reverse the damage ... he was pretty sure it would still save Seels-Davila's life ... and very sure that if Hahnemann doctors didn't give her blood, that she would die." Id. at 25-26. This plea did not change the resolve of Seels-Davila's parents, who, according to Dr. Daniels, told her "that it was God's will, they stood strong in their faith i.e. that of the Jehovah's Witnesses, and on behalf of their daughter declined any blood products." N.T. 4/22/15 at 48. Later that day, Dr. Daniels and Dr. Montgomery contacted Levi Davila-Rios, Seels-Davila's husband, who was still involved in missionary work in Nicaragua, to see if he would authorize a blood transfusion for his wife. Id. at 52. In addition they

attempted to secure an emergency visa for him, so that he could be with Seels-Davila. Id. at 53. Despite these efforts, Mr. Davila-Rios also declined to assent to the transfusion, saying that he did not want to go against his wife's wishes or submit her to medical treatment that violated her religious beliefs. Id.; N.T. 4/24/15 at 73, 77-78.

Seels-Davila's condition continued to deteriorate and, on the morning of November 28, 2010, she passed away, in spite of her doctors' uniform belief that a blood transfusion would have almost certainly saved her life. Id. at 45, 53-56 (testimony from Dr. Daniels; N.T. 4/24/15 at 21-24 (Appellant stating that Hahnemann personnel told him that Seels-Davila needed a blood transfusion); id. at 30-31 (noting date of death); N.T. 4/28/15 at 26 (testimony from Dr. Montgomery). **Critically important in this case is that even Appellant's <u>own</u> expert, Dr. Prince testified that that a blood transfusion would have likely saved Seels-Davila from her ultimate fate.** See N.T. 4/23/15 at 117 (Drexel's Attorney: "If Ms. Seels-Davila received a blood transfusion, do you believe she would have survived?" Dr. Prince: "More likely than not, yes, she probably would have survived.").

Trial Court Opinion, 6/14/16, at 2-14 (footnotes and internal brackets omitted) (emphases in original).

On September 6, 2012, Appellant filed a medical malpractice suit against Appellees and included claims of vicarious liability, corporate negligence, negligent infliction of emotional distress, wrongful death, and survival. Appellant filed an Amended Complaint on October 19, 2012, and Appellees responded by filing preliminary objections. On December 20, 2012, the trial court sustained in part and overruled in part Appellees' Preliminary objections. The trial court struck, without prejudice, Appellant's claims of negligence against unnamed agents, servants, employees, contractors, workmen, and apparent or ostensible agents and other

- 10 -

language deemed overly broad in Appellant's Amended Complaint at paragraphs 8, 24, 34, 62, 63, 66, 75, 79, 80, 82, 93, and 95. Order (Drexel), 12/20/12; Order (Hahnemann), 12/20/12. Despite the trial court striking these claims without prejudice, Appellant did not file a second amended complaint.

A jury trial began on April 21, 2015, and on April 30, 2015, the jury returned a verdict in favor of Appellees. The jury found that the conduct of Dr. Green and Dr. Daniels did not fall below the applicable standard of care. N.T. 4/30/15 at 5-6. Thus, there was no negligence which could stand as the basis for Appellant's ancillary claims, including vicarious liability. Accordingly, the trial court entered a verdict in favor of Appellees. Appellant filed post-trial motions, and the trial court denied the motions on May 13, 2015. Appellant filed a notice of appeal on June 5, 2015.

On June 26, 2015, Appellant filed a twenty-two-page Pa.R.A.P. 1925(b) statement containing nineteen issues with subparts.[2] Appellees

---

[2] On July 20, 2015, this Court informed Appellant that he had improperly appealed from the order denying his post-trial motions, and that an appeal lies only from judgment entered subsequent to the trial court's disposition of post-trial motions. Order, 7/20/15 (citing Pa.R.A.P. 301; *Vance v. 46 And 2, Inc.*, 920 A.2d 202 (Pa. Super. 2006); and *Melani v. Northwest Engineering, Inc.*, 909 A.2d 404 (Pa. Super. 2006)). This Court directed Appellant to *praecipe* the trial court Prothonotary to enter judgment on the verdict in favor Appellees and file with the Prothonotary of this Court a certified copy of the trial court docket reflecting the entry of the judgment. *Id*. On July 28, 2015, Appellant complied with this Court's directive and certified that on July 22, 2015, judgment was entered on the verdict. *(Footnote Continued Next Page)*

filed a motion to dismiss this appeal due to the length, format, bad faith, and the sheer number of issues Appellant purported to raise in his Pa.R.A.P. 1925(b) statement. Motion, 7/12/16. This Court denied that motion on August 16, 2016. Despite Appellant's verbose and repetitive Pa.R.A.P. 1925(b) statement, we conclude that each of the questions presented in Appellant's brief was preserved in the issues set forth in the Pa.R.A.P. 1925(b) statement or were fairly suggested thereby. Thus, we also decline the trial court's suggestion that this Court quash the appeal due to the Pa.R.A.P. 1925(b) statement being "incomprehensible." Trial Court Opinion, 6/14/16, at 22.[3]

In his brief on appeal, Appellant reduced the number of issues as follows:

> I. Whether the trial court wrongfully precluded an expert witness from testifying?
>
> II. Whether the trial court erred as a matter of law and abused its discretion and committed reversible error in excluding Appellant's claims of corporate negligence against Appellees.
>
> III. Whether the trial court erred in permitting the admission of the consents for treatment into evidence in a medical malpractice trial at the time of trial which was an error of law.

_(Footnote Continued)_ ───────────────

Response to Order, 7/28/15. Thus, this appeal is now properly before this Court.

[3] We note also that the trial court diligently analyzed Appellant's garrulous Pa.R.A.P. 1925(b) statement in an effort to address the myriad issues presented.

IV. Whether the trial court erred and abused its discretion and committed reversible error in the jury slip?

Appellant's Brief at 6 (full capitalization omitted).[4]

In Appellant's first issue on appeal, he alleges that the trial court erred in precluding the testimony of a proffered expert witness. "Whether a witness has been properly qualified to give expert witness testimony is vested in the discretion of the trial court." *Kovalev v. Sowell*, 839 A.2d 359, 362-363 (Pa. Super. 2003) (citation omitted). "It is well settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one. When determining whether a witness is qualified as an expert the court is to examine whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation." *Id*. (citations omitted).

> The determination of whether a witness is a qualified expert involves two inquiries:
>
>> When a witness is offered as an expert, the first question the trial court should ask is whether the subject on which the witness will express an opinion is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman. ... If the subject is of this sort, the next question the court should ask is whether the witness has sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.

_____

[4] For purposes of our discussion, we have renumbered Appellant's issues.

*Sowell*, 839 A.2d at 363 (citations and quotation marks omitted).

The trial court denied Appellant's attempt to have Dr. Ronald Paynter, M.D., testify as an expert to support the claim that Hahnemann had committed corporate negligence by failing to properly operate, staff, and maintain its bloodless medicine program. N.T., 4/20/15, at 68-90. The trial court concluded that Dr. Paynter's expert report was misleading because the bloodless medicine program was an administrative program, and there was no evidence that Dr. Paynter was an expert or had any experience in bloodless medicine. Trial Court Opinion, 6/14/16, at 15. Thus, there was no evidence that Dr. Paynter had any specialized knowledge on the subject of this type of administrative program, and his testimony would only confuse the jury. *Id*. The trial court stated:

> this [c]ourt disqualified Dr. Paynter because his report mischaracterized the nature of bloodless medicine, as well as the role of the bloodless medicine program itself in handling Hahnemann patients, and because Dr. Paynter had provided nothing whatsoever to show that he had any experience or specific knowledge as to how such "programs" are supposed to be run. As was borne out throughout the trial, from physician witnesses, and experts on both sides, **there is no specialized medical training that doctors ever receive in "bloodless medicine.**" Dr. Paynter completely mischaracterized the function of the clerks who staffed the Bloodless Medicine Program at Hahnemann.

*Id*.

The trial court further explained its decision as follows:

> In the instant matter, it was abundantly clear that Dr. Paynter had no specialized knowledge regarding bloodless medicine programs, or even an accurate grasp of what

"bloodless medicine" actually entailed. Consequently, allowing him to testify would have misled the jury and had an unfairly prejudicial impact on Hahnemann's defense. In his report, Dr. Paynter identified himself as "an expert in the administrative standards applicable to hospitals in the United States, including Hahnemann," and stated that it was his opinion that Hahnemann had not "provided a bloodless medicine program despite holding itself out as a hospital that offered such a program" by failing to provide "specific training in the methods required to deal with bloodless medicine patients." Paynter Expert Report at 1, 3. He then followed this by listing twenty-one separate "hospital accreditation standards," each of which were accompanied by a vague, single-sentence description, opining "that Hahnemann failed to comply with the above standards," without ever explaining specifically how they were violated. Id. at 5. Dr. Paynter then closed with a general, catchall paragraph in which he stated that he believed, "with a reasonable degree of medical certainty," that Hahnemann

> willfully and negligently failed to provide executive and management oversight, supervision, education, competency-based training, planning sufficient staff, resources, policies and an effective performance improvement/quality assurance program to its patients and staff. The hospital administration and/or governing boards knew or should have known that failure to ensure the provision of executive and management oversight, supervision, education, competency based training, sufficient staff, resources, policies, and ·an effective quality assurance program to the Center would endanger patients and likely result in injuries and death to patients such as Ms. Seels-Davila. These deviations did result in her injuries and death.

Id. at 6-12. Distinctly absent from these materials was anything suggesting that Dr. Paytner had any *specific* experience in creating, operating, or supervising a bloodless medicine program at an **administrative** level, that he had *specific* knowledge about cell saver machines or autologous blood transfusions, or that he knew or understood what *specific* types of bloodless medicine "training" would have satisfied the applicable standard of care under the circumstances. Id. at 1-12; *see* N.T. 4/20/15 at 70,[52] 80-92 (discussing this [c]ourt's reasoning).

- 15 -

[52] **This** [c]**ourt:** "Dr. Paynter basically just recites the history as he reads the records, and just says, 'this is clear that they violated all kinds of standards.' But he doesn't ever say specifically what standards should be in this practice, this discreet and specialized practice, of bloodless medicine, whether it's transfusion or cell savers or perfusionists. He never says that. He just said Seels-Davila died and therefore, the Hahnemann staff ... did everything wrong."

Moreover, Dr. Paynter's depiction of "bloodless medicine" grossly mischaracterized the nature of the concept itself, and would have given the jury a starkly inaccurate understanding of what it actually entails. As described by Dr. Paynter in his report, "bloodless medicine" is purportedly a distinct field, for which medical personnel need to receive specialized training in order to provide competent, effective care. *See* Paynter Expert Report at 2-3. In reality, however, "bloodless medicine" requires nothing of the sort. Rather, as the testimony at trial clearly revealed, even by [Appellant's] own expert, all doctors always try to minimize surgical blood loss and can, and do, capably treat patients who refuse, for one reason or another, to allow the use of various blood products during the course of their treatment, without needing to have some sort of formalized expertise. There are no specific medical courses or training in "bloodless medicine" as such knowledge in this area is part and parcel to, and integrated, into the overall general medical training. *See* N.T. 4/21/15 at 66, 94-95 (testimony from Dr. Green);[54] N.T. 4/22/15 at 8-9 (testimony from Dr. Daniels);[55] Appellant's Motion in Limine to Exclude in Part the Appellees' Expert Testimony of Arnold W. Cohen, M.D., Ex.Cat 4-6 ("Cohen MIL") (Frank expert report). [56] Indeed, even Dr. Prince, *Appellant's own expert*, admitted that not only had he himself never been specially trained in bloodless medicine, and that such training did not actually exist. N.T. 4/23/15 at 56-57.

[54] **Appellant's Attorney:** "Is it fair to say, ma'am, that during your medical education, you had no specific education in bloodless medicine?" **Dr. Green:** "The education is on the job education, as [with] many aspects of our training." ... **Appellant's Attorney:** "Now, the bloodless medicine program as

you understood it, is it fair to say that if you knew a patient was in the bloodless program, that the doctors and the medical team had to be careful to prevent the loss of blood?" **Dr. Green:** "We are careful with the prevention of loss of blood with every patient." **Appellant's Attorney:** "And that's fair to say." **Dr. Green:** "With every patient, yes." **Appellant's Attorney:** "But for a person who has sought out bloodless medicine, would there have been a heightened recognition of blood loss by you?" **Dr. Green:** "I treat every surgery as a heightened. Blood loss is important and I'm a surgeon, so every case I treat the same. Blood loss is at the top of the list particularly for delivery, for any form of delivery." **Appellant's Attorney:** "Is it also fair to say that you would have been warned or notified of her blood loss status because of a band that she would have worn?" **Dr. Green:** "That's one of the identifiers. It's very similar to an allergy band for other staff members. But again, we were already taken care of her, so this is something we already knew about." **Appellant's Attorney:** "Is it also fair to say that on a patient who has a bloodless medicine designation, that it should be the most skilled person in the surgical practice who performs the surgery on her?" **Dr. Green:** "What is that based on?" **Appellant's Attorney:** "I'm asking you is that your understanding or was that your understanding then?" **Dr. Green:** "The surgery is performed the same way. There is no different way to do a C-section for a bloodless patient, for a Jehovah's Witness, than someone that does accept blood. We have techniques. We are meticulous with every surgery. There is no different technique because she is Jehovah's Witness. There is no special way to do a C-section on a Jehovah's Witness."

55 **Dr. Daniels:** "So while I was at Drexel, I was a clinical assistant-your first year at Drexel, you're a clinical assistant. You pass your boards. I passed my boards my first year. You then become an assistant professor. I was also in charge of the medical students for 2007 until January of 2010. I was also-I ran the fourth-year clerkship pathway. So medical

students who were interested in OB/GYN, went into this OB/GYN pathway which I also ran. And I was also in charge of what we call the physician refresher programs. The physicians who were in the field of obstetrics and gynecology, who had been out of practice for a while, who were trying to get back into practice, had a way to learn-to make sure their skills were up-to-date and to learn new evidence and to work on their skills." **Appellees' Attorney:** "Do you know of any specialized training for the care of bloodless medicine patients?" **Dr. Daniels:** "No." **Appellees' Attorney:** "Did Appellant's Attorney ever bring to your attention during her examination of you here or in the deposition, any training or specialized training which exists anywhere for care of bloodless medicine patients?" **Dr. Daniels:** "No."

[56] "The standard of care for treating obstetric patients who do not accept allogenic blood transfusions is the same as the population at large. Entry into a bloodless program does not change the standard of care ... Dr. Paynter opines that the physicians and nurses in this case did not have any formal training in the care of Bloodless Medicine patients. The primary reason for this "lack" of training is that no such formal training exists. I am unaware of such a training program even in the most comprehensive academic medical centers."

Dr. Paynter's obviously confused and mischaracterized an administrative function staffed by individuals **without** medical training, who are tasked with assisting patients in understanding the ramifications and risks of refusing blood transfusions, offering them alternatives to blood transfusions, and ensuring that medical staff are made aware that a particular patient is a "bloodless patient" - one who does not accept blood transfusions. *See* Cohen MIL, Ex. C at 4 (Frank expert report);[58] *see also* N.T. 4/20/15 at 84-85.[59]

[58] "The focus of a Bloodless Medicine program is to help Jehovah's Witness patients with their advanced directives form, which can be confusing since the patient is given choices of which blood products and blood derivatives they are willing to accept. The

advanced directive form is usually filled out by the patient, with guidance from a program coordinator, who is often a Jehovah's Witness themselves, with no formal medical training, but rather on the job training attained by working in the hospital. Most Bloodless Medicine programs operate in this fashion, as did Hahnemann's ... program."

[59] **This** [c]**ourt:** "I have determined in this case is when they say bloodless medicine, it is [sic] truly refers to an administrative program ... The bloodless medicine program is a group of people who work with individuals to explain their options and what they can and can't do ... I don't believe Dr. Paynter has presented any ... specialized knowledge on the subject of this type of administrative program. So I think that you can see that when he does it in his report. He is referring to medical issues, not administrative issues. So I do believe it would confuse the jury."

The issues in this case were whether Appellees' doctors were negligent in the performance of the C-section and in their care and treatment of Seels-Davila afterwards, not whether a clerk at the bloodless medicine program deviated from a standard of care. Accordingly, as Dr. Paynter neither established that he had any level of specialized experience regarding bloodless medicine related administrative programs, nor had an accurate grasp of what constitutes "bloodless medicine," this [c]ourt properly refused to qualify him as an expert in that subject, and correctly prevented him from testifying in support of Appellant's corporate negligence claim against Hahnemann.

Trial Court Opinion, 6/14/16, at 26-29 (some footnotes omitted) (*sic erat scriptum* notation omitted) (emphases in original).

After review, we discern no abuse of discretion by the trial court in refusing to qualify Dr. Paynter to testify as an expert. Dr. Paynter appears to conflate the medical objective of minimizing blood loss during surgery with a "bloodless medicine" program, which, as presented is primarily

administrative. Dr. Paynter failed to establish that he had any specialized skill, knowledge, or experience in the area of bloodless medicine that would have aided the jury in the search for truth. *Sowell*, 839 A.2d at 363. Rather, we agree with the trial court that Dr. Paynter's proposed testimony would have only served to confuse the jury. Therefore, we conclude that Appellant is entitled to no relief on this claim of error.

Second, Appellant argues that the trial court erred in excluding Appellant's claims of corporate negligence and granting Appellees' motion for nonsuit. Our standard of review of an order granting compulsory nonsuit is as follows:

> A motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiff's evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the submission of the case to the jury.

*Reading Radio, Inc. v. Fink*, 833 A.2d 199, 209-210 (Pa. Super. 2003) (citation omitted).

"Pennsylvania recognizes the doctrine of corporate negligence as a basis for hospital liability separate from the liability of the practitioners who actually have rendered medical care to a patient." *Rauch v. Mike-Mayer*, 783 A.2d 815, 826 (Pa. Super. 2001) (citation omitted). The doctrine of corporate negligence imposes a non-delegable duty on the hospital to uphold

- 20 -

a proper standard of care to patients. *Id*. A hospital is directly liable under the doctrine of corporate negligence if it fails to uphold any one of the following four duties:

1. a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;

2. a duty to select and retain only competent physicians;

3. a duty to oversee all persons who practice medicine within its walls as to patient care; and

4. a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

*Id*. at 826-827 (quoting ***Thompson v. Nason Hospital***, 591 A.2d 703, 707-708 (Pa. 1991)). In order to establish a *prima facie* case of corporate negligence, a plaintiff must demonstrate:

1. the hospital acted in deviation from the standard of care;

2. the hospital had actual or constructive notice of the defects or procedures which created the harm; and

3. that the conduct was a substantial factor in bringing about the harm.

*Id*. at 827 (citation omitted). "Unless a hospital's negligence is obvious, an expert witness is required to establish two of the three prongs: that the hospital deviated from the standard of care and that the deviation was a substantial factor in bringing about the harm." *Id*. (citation omitted).

As discussed above, Appellant failed to produce an expert competent to testify regarding Appellees' bloodless medicine policies or the applicable standard of care. As such, we agree with the trial court's conclusion to grant

- 21 -

Appellees' motion for nonsuit as Appellant failed to provide the required support for a claim of corporate negligence. *Reading Radio, Inc.*, 833 A.2d at 209-210; *Rauch*, 783 A.2d at 827. Accordingly, no relief is due.

Next, Appellant avers that the trial court erred in denying his motion *in limine* in which he sought to preclude the admission of the consent-for-treatment evidence. We disagree.

A motion *in limine* is a pretrial mechanism to obtain a ruling on the admissibility of evidence, and it gives the trial judge the opportunity to weigh potentially prejudicial and harmful evidence before the trial occurs, preventing the evidence from ever reaching the jury. *Parr v. Ford Motor Co.*, 109 A.3d 682, 690 (Pa. Super. 2014) (citation omitted). "A trial court's decision to grant or deny a motion in limine is subject to an evidentiary abuse of discretion standard of review." *Id*. at 690-691 (citation and quotation marks omitted).

> Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

*Id*. (internal citations omitted). "In addition, to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Id*. (internal citations and quotation marks omitted). Evidence is relevant if it has "any tendency to make a fact

- 22 -

of consequence more or less probable than it would be without the evidence." **_Brady v. Urbas_**, 111 A.3d 1155, 1161 (Pa. 2015) (quoting Pa.R.E. 401). "Evidence about the risks of surgical procedures, in the form of either testimony or a list of such risks as they appear on an informed-consent sheet, may also be relevant in establishing the standard of care." **_Brady_**, 111 A.3d at 1161-1162 (Pa. 2015) (citation omitted). In this regard, we note that the threshold for relevance is low due to the liberal "any tendency" prerequisite. **_Id_**. at 1162.

The trial court thoroughly addressed this issue:

> Generally, with regard to medical consent and release forms, in situations where a plaintiff "only asserts negligence, and not lack of informed consent, evidence that a patient agreed to go forward with the operation in spite of the risks of which she was informed is irrelevant and should be excluded." Brady v. Urbas, 111 A.3d 1155, 1162-63 (Pa. 2015). This is because "there is no assumption-of-the-risk defense available to a defendant physician which would vitiate his duty to provide treatment according to the ordinary standard of care and, thus, a patient's actual, affirmative consent ... is irrelevant to the question of negligence." Id. at 1162. _However_, this legal precedent has never established a _per se blanket prohibition_ against the admission of consent and release forms at trial. Indeed, the Pennsylvania Supreme Court has noted that such "information may be relevant to the question of negligence if, for example, the standard of care requires that the doctor discuss certain risks with the patient. Evidence about the risks of surgical procedures, in the form of either testimony or a list of such risks as they appear on an informed-consent sheet, may also be relevant in establishing the standard of care." Id. at 1161-62.[61] As such, "not all aspects of informed-consent information are always irrelevant in a medical malpractice case." Id. at 1162 (citation and quotation marks omitted).
>
> > [61] In _dicta_, the Pennsylvania Supreme Court noted that other courts have found that proof of consent

- 23 -

could be relevant and admissible where a patient has agreed to submit "to 'an experimental medical procedure where the standards of care have not yet been fully developed or consents to treatment modalities known to be outside of the medical mainstream,'" or where the patient has "expressly consented to any particular risks associated with the unconventional or experimental treatment." Brady, 111 A.3d at 1162 n. 7 (*citing and quoting* Storm v. NSL Rockland Place. LLC, 898 A.2d 874, 884 (Del. Super. Ct. 2005) and Schneider v. Revici, 817 F.2d 987, 995-96 (2d Cir. 1987)).

This [c]ourt determined that the unique circumstances of this matter rendered Seels-Davila's consent and release forms absolutely relevant and essential to the truth seeking function of a jury trial. It would have been manifestly unjust and improper to not allow them into evidence. Indeed, rather than allowing for misconceptions to arise about Seels-Davila "consenting" to substandard medical care at Hahnemann, the consents and releases made clear that Seels-Davila, of her own free will, consistently refused to accept safe, effective, routine, and life-saving medical treatment when she barred her doctors from administering blood transfusions, and even refused to collect and store her own blood in the event an emergency arose. There was not a shred of doubt that Seels-Davila fully understood the life-threatening ramifications of her decision to be a "bloodless" patient, and that she specifically agreed to hold the doctors harmless for any negative outcomes of her decision. *See* Consent MIL, Exs. A-E; *see also* N.T. 4/21/15 at 69-72 (testimony from Dr. Green); N.T. 4/22/15 at 45-46 (testimony from Dr. Daniels); N.T. 4/23/15 at 114-17 (testimony from Dr. Prince); N.T. 4/27/15 at 93-97 (testimony from Dr. Musselman); N.T. 4/28/15 at 35-36 (testimony from Dr. Montgomery). For these reasons, this Court properly allowed into evidence Seels-Davila's signed consent and release forms and testimony regarding the circumstances surrounding these executed forms.

Trial Court Opinion, 6/14/16, at 33-34.

We agree with the trial court's analysis, and we discern no abuse of discretion in its ruling on the admissibility of the consent forms. The consent

forms were not admitted merely to show that Seels-Davila understood the risks of treatment yet elected to proceed; rather, the consents were admitted to prove that Seels-Davila knowingly refused treatments that would have saved her life. Accordingly, Appellant is due no relief on this issue.

Finally, Appellant argues that the trial court erred in the language utilized on the jury verdict slip because it did not permit the jury to consider whether "other" unnamed hospital staff members or agents were negligent. Appellant's Brief at 37. This argument is meritless, and it fails to acknowledge or address a pretrial ruling striking allegations in Appellant's complaint.

At the outset, we note that when we examine a trial court's instructions to the jury, we review the instructions to determine whether the trial court committed an abuse of discretion or error of law controlling the outcome of the case. *Bannar v. Miller*, 701 A.2d 232, 240 (Pa. Super. 1997) (citation omitted).[5]

> Error in a charge is sufficient ground for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead of confuse rather than clarify a material issue. A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts

---

[5] While Appellant in the case at bar presents a challenge to the verdict sheet as opposed to the oral instructions to the jury, in *Bannar*, this Court addressed those issues together and under the same standard.

to fundamental error. When reviewing a charge to the jury, we will not take the challenged words or passage out of context of the whole of the charge, but must look to the charge in its entirety.

*Id*. (internal citations and quotation marks omitted).

The trial court addressed this issue as follows:

Appellant next asserts that this [c]ourt erred:

[w]hen it included the names of Dr. Minda Green and Dr. Kelli Daniels on the verdict sheet, who were not named as Defendants to this action ... and erred ... and abused its discretion in failing to also include the names and positions of other staff and agents of Appellees caring for Seels-Davila on the specific verdict sheet other than Dr. Minda Green and Dr. Kelli Daniels and failing to instruct on the correct parties ... The named parties on the verdict sheet were not the parties named to the lawsuit and other named and unnamed individuals were not included on the verdict sheet ... The jury verdict form was defective in that it did not include other staff and agents working at Hahnemann Hospital caring for Seels-Davila during the relevant time such as nursing staff, other professionals, and residents who committed negligence.[6]

Appellant's line of argument is absurd on its face, given that he asserted in his *own Amended Complaint* that Appellees were vicariously liable for Drs. Daniels' and Green's allegedly negligent acts, and Appellant's counsel used Dr. Prince's testimony to suggest that these two doctors gave Seels-Davila substandard treatment. See Amended Complaint at 7, 14; N.T. 4/23/15 at 34-55, 57-144 (testimony from Dr. Prince regarding treat[ment] provided by Drs. Daniels and Green to Seels-Davila). Furthermore, the verdict sheet's plain language that Drs. Daniels and Green were being referred to therein as Appellees' **agents or employees**, rather than as direct defendants. *See* id.[62]

_____

[6] Appellant's Pa.R.A.P. 1925(b) statement, 6/26/16, at 9-10.

- 26 -

[62] "Question 1 Do you find that the conduct of either Dr. Minda Green or Dr. Kelli Daniels acting as agents of the Appellees ... fell below the applicable standard of care? ... Question 3 If you answered "YES" to Question 1, was the negligence of Dr. Minda Green and/or Dr. Kelli Daniels, as agents or employees of Appellees ... the factual cause of Appellant's damages?"

Additionally, Appellant's counsel fails to identify, in anything more than vague terms, any other agents or employees for whom Appellees were vicariously liable who should have been named on the verdict sheet. *See* Statement of Errors at 9-10. The only evidence of possible negligence presented by Appellant pertained to the actions of Doctors Green and Daniels. Assuming arguendo that this allegation of error referred to the Hahnemann PACU staff, *see* N.T. 4/28/15 at 47, 111-12, this argument is still without merit. First, as noted *supra*, Judge Panepinto struck "all of Appellant's allegations of negligence against unnamed agents, servants, workmen, employees, contractors and/or apparent of ostensible agents of Hahnemann," without prejudice on December 20, 2012. *See* Panepinto Order, 12/20/12 #1 at 1. At no point thereafter did Appellant's counsel address this ruling by filing a more specific Second Amended Complaint on behalf of her client. Therefore, with regard to Hahnemann, the only employees or agents for which that entity could have been deemed vicariously liable were those *specifically named* in Appellant's Amended Complaint, a group which obviously did not include the unidentified members of the PACU staff.[63] Moreover, despite Appellant's counsel claim that her client was prejudiced by the "error", counsel has failed to offer a scintilla of evidence, or explanation, as to the nature of the prejudice.

[63] It would have been erroneous for Judge Panepinto to strike these allegations with prejudice, as vicarious liability can attach even where "employees are unnamed within a complaint or referred to as a unit, *i.e.*, the staff." Sokolsky v. Eidelman, 93 A.3d 858, 866 (Pa. Super. Ct. 2014). However, by dismissing said allegations *without* prejudice, Judge Panepinto offered Appellant's counsel a chance to revise the allegations contained in her client's Amended Complaint, in order to more specifically

> link these unnamed agents and employees to allegedly tortious acts. She, of course, did not avail herself of this opportunity.

Trial Court Opinion, 6/14/16, at 35-36 (emphases in original) (*sic erat scriptum* notations omitted). We agree with the trial court's conclusions, and we conclude that Appellant is entitled to no relief on this issue.

After review, we discern no errors of law or abuses of discretion committed by the trial court. Accordingly, we affirm the July 22, 2015 judgment entered in favor of Appellees.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/18/2017