J-A06023-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DAREN OUTTERBRIDGE, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF YHVETTA P. OUTTERBRIDGE, DECEASED | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : : | No. 1261 EDA 2024 |
| TRI-COUNTY EMERGENCY PHYSICIANS, LLC, WYNCOTE FAMILY MEDICINE, PC, SUZANNE SHORTEN, MD, KENNETH S. WEISS, DO, BRENT C. BEDDIS, DO, ABINGTON JEFFERSON HEALTH, ABINGTON HEALTH PHYSICIANS, ABINGTON OBSTETRICAL AND GYNECOLOGICAL ASSOCIATES, KATIE GARRELTS, MD, CHESTNUT HILL HOSPITAL, CHESTNUT HILL HOSPITAL, LLC, CHESTNUT HILL HEALTH SYSTEM, LLC, CHHS HOSPITAL COMPANY, LLC, READING HEALTH SYSTEM, TOWER HEALTH, AMANDA HOWELL, MD, TRI-COUNTY EMERGENCY PHYSICIANS AT CHESTNUT HILL HOSPITAL, ABINGTON HEALTH PHYSICIANS | : : : : : : : : : : : : : : : : : : : : : : : : | |

Appeal from the Judgment Entered May 1, 2024
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 191200157

BEFORE:  PANELLA, P.J.E., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.:                    **FILED MARCH 28, 2025**

_____

[*] Former Justice specially assigned to the Superior Court.

Appellant, Darren Outterbridge, individually and as administrator of the estate of Yhvetta P. Outterbridge, appeals from the judgment entered on May 1, 2024 in the Court of Common Pleas of Philadelphia County after the jury returned a verdict in favor of Appellees, Abington Memorial Hospital ("Abington"), Suzanne Shorten, M.D., Kenneth Weiss, D.O., and Brent C. Beddis, D.O., and the court denied his motion for a new trial. After careful review, we affirm on the basis of the well-reasoned opinion of the trial court dated September 12, 2024.

The trial court summarized the factual and procedural history of the case. **See** Trial Court Opinion, 9/12/24, at 1-6. Therefore, a detailed recitation of the underlying facts is unnecessary. It is sufficient for our disposition to state that Appellant initiated this medical malpractice action after his late wife passed unexpectedly on May 10, 2018 at the age of 39. Mrs. Outterbridge's cause of death, which the Philadelphia Medical Examiner's Office determined to be dilated cardiomyopathy, was disputed at trial. From 2009 to 2018, Mrs. Outterbridge treated with the Appellee primary care physicians at Wyncote Family Medicine, which is owned by Abington. Appellant alleges the Appellee physicians breached the standard of care by not referring Mrs. Outterbridge to a cardiologist for complaints of chest pain.

During the trial that took place from February 12 to March 1, 2024, the jury heard the testimony of expert witnesses and of the individual Appellee physicians, who maintained that they did not breach the standard of care

because they did not believe Mrs. Outterbridge's complaints of chest pain were cardiac. The jury credited this testimony and returned a verdict for Appellees.

Appellant filed a motion for a new trial, in which he alleged that "the jury's verdict resulted from erroneous and prejudicial evidentiary and legal rulings." Motion for New Trial, 3/11/24, at 4. The trial court denied Appellant's post-trial motion by order dated April 11, 2024. On May 10, 2024, Appellant filed a notice of appeal.

Appellant raises the following issues for our review:

1. Whether the trial court erred by improperly precluding [Appellant's] counsel from impeaching [Appellees'] expert cardiology witness, Eliott Gerber, MD, and Brent Beddis, DO, with standard literature, a Heart Rhythm Society/American Heart Association Expert Consensus Statement, that [Appellant's] expert had already authenticated, and which contradicted [Appellees'] witnesses' testimony.

2. Whether the trial court erroneously permitted [Appellees] to argue, over [Appellant's] objections, that they were vindicated by the actions of Mrs. Outterbridge's medical providers in other specialties who did not refer [Mrs. Outterbridge] to a cardiologist, including her treating gynecologist, creating the prejudicial and misleading impression that Mrs. Outterbridge's treating gynecologist and other specialists agreed that [Appellees] met the standard of care by not referring [Mrs. Outterbridge] to a cardiologist, and the Court further precluded [Appellant] from introducing testimony that refuted [Appellees'] argument, in particular testimony from Mrs. Outterbridge's treating gynecologist that if a patient needed an outpatient workup with a cardiologist she expected the patient's primary care physician would manage that referral.

3. Whether the trial court improperly denied [Appellant's] request for Abington Memorial Hospital to appear on the verdict sheet for the negligence of its staff despite the physician [Appellees] themselves offering testimony that its clerical staff may have negligently failed to follow protocol and provide the physician

[Appellees] with important faxes from outside sources regarding Mrs. Outterbridge's cardiac condition, thereby permitting the jury to conclude that none of the physician [Appellees] on the verdict sheet were liable for [Appellant's] harm.

4. Whether the trial court improperly granted [Appellees'] motion *in limine* and precluded [Appellant's] counsel from referring to or cross examining the [Appellee] doctors about their deposition testimony that their real-time, contemporaneous, rationale for assessing Mrs. Outterbridge's cardiac risk factors as being low despite her having a brother who suffered a premature sudden cardiac death included that they thought Mrs. Outterbridge's brother could have been a drug user.

5. Whether the trial court erroneously denied [Appellant's] motion *in limine* and allowed [Appellees] to introduce irrelevant questioning and evidence that [Appellant] continued to treat with [Appellees'] primary care practice group after his wife's death, and thereby permitted [Appellees] to misleadingly and prejudicially argue that Mr. Outterbridge was "lying" about this collateral and irrelevant issue, and that [Appellant's] entire case was untrustworthy and unmeritorious as a result of his continued treatment.

Appellant's Brief, at 6-8 (trial court answers omitted). Appellant maintains that a new trial is warranted based on these alleged errors. *See id.*, at 73-74.

"We will reverse a trial court's decision to deny a motion for a new trial only if the trial court abused its discretion[,]" which exists where "the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *Risperdal Litig. W.C. v. Janssen Pharm., Inc.*, 174 A.3d 1110, 1117 (Pa. Super. 2017) (citations omitted).

Furthermore,

[d]ecisions regarding the admissibility of evidence are within the discretion of the trial court and will be reversed on appeal only if

- 4 -

the trial court abused its discretion or committed an error of law.… We will grant a request for a new trial based upon a trial court's evidentiary rulings only if those rulings not only are erroneous, but also are harmful to the complaining party.… Evidence is relevant if it logically tends to establish a material fact in the case, tends to make the fact at issue more or less probable, or supports a reasonable inference or presumption about the existence of a material fact.

*A.Y. v. Janssen Pharm. Inc.*, 224 A.3d 1, 21 (Pa. Super. 2019) (citation omitted).

Similarly, we review a trial court's decision regarding what is included on a jury verdict sheet for an abuse of discretion or an error of law. *See Seels v. Tenet Health Sys. Hahnemann, LLC*, 167 A.3d 190, 207-08 n.5 (Pa. Super. 2017); *see also Hyrcza v. West Penn Allegheny Health Sys., Inc.*, 978 A.2d 961, 968 (Pa. Super. 2009).

After careful consideration of the record, the parties' briefs, and the Honorable Angelo J. Foglietta's 28-page opinion dated September 12, 2024, we conclude Appellant's issues merit no relief. The trial court's opinion comprehensively disposes of the issues raised by Appellant, with citations to the record, and we discern no abuse of discretion or legal error.

Accordingly, we affirm on this basis of the September 12, 2024 opinion, which we have attached for the convenience of the parties.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 10/3/2023

**COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**

DAREN OUTTERBRIDGE, Individually :
And as Administrator of the Estate of : DECEMBER TERM, 2019
YHVETTA P. OUTTERBRIDGE, deceased: NO.: 00157
        *Plaintiff,* :
        v. : SUPERIOR COURT NO.
ABINGTON MEMORIAL HOSPITAL, et al: 1261 EDA 2024
        *Defendants.* :

## OPINION OF THE COURT

This is the appeal of Plaintiff Darren Outterbridge, individually and as administrator of the estate of Yhvetta P. Outterbridge, following a jury's determination that Defendants Abington Memorial Hospital, Suzanne Shorten, M.D., Kenneth S. Weiss, D.O., and Brent C. Beddis, D.O., did not breach the standard of care necessary to provide proper medical care and services to Mrs. Outterbridge whose cause of death at thirty-nine years old was disputed at trial.

On October 12, 2009, Mrs. Outterbridge became a primary care patient of Wyncote Family Hospital. On her first visit there, she saw Dr. Shorten for a physical exam. Because Mrs. Outterbridge's intake paperwork indicated that she wanted to address ongoing chest pain, Dr. Shorten took a history which detailed prior chest pain that was relieved by a "GI cocktail" and Dr. Shorten listened to Mrs. Outterbridge's heart and performed an electrocardiogram ("EKG") in the office. Dr. Shorten found both to be "normal." She prescribed antiacids and ordered bloodwork to check Mrs. Outterbridge's cholesterol. N.T. Feb. 13, 2024 P. 41-42.

A few months later, on January 4, 2010, Mrs. Outterbridge returned to Wyncote Family Hospital to be treated for stomach pain. She saw Dr. Shorten who checked her heart and reported a normal rate and regular rhythm. In November 2010, Mrs. Outterbridge presented to Abington Hospital for abdominal pain where she was examined and found again to have a "normal" heart



19120015700534

rate and rhythm and no complaints of chest pain. N.T. Feb. 13, 2024, P. 48-49. She saw her gynecologist in 2012 with no complaints of chest pain, palpitations, or shortness of breath. Id. P. 52. In April 2012, Mrs. Outterbridge presented to her primary care practice with gynecologic problems and then presented to Chestnut Hill Hospital for the same in September 2012.

On December 8, 2012, Mrs. Outterbridge's brother, Nathaniel Woodard, died at forty-three years old from athererosclerotic disease/ a myocardial infarction (heart attack). N.T. Feb. 13, 2024, P. 31, L. 16-20. On December 30-31, Mrs. Outterbridge was admitted into Chestnut Hill Hospital for a uterine issue causing vaginal bleeding, blood clots, and groin pain. N.T. Feb. 13, 2024 PM, P. 55, L. 12-14, P. 58, L.19-25.

Nine days later, on January 9, 2013, Mrs. Outterbridge saw her gynecologist, Dr. Lynda Thomas-Mabine, in office and complained of chest pain—her first complaints of chest pain since 2009. N.T. Feb. 13, 2024, P. 60, L. 2-13, N.T. Feb. 21, 2024, P. 81-82. Dr. Thomas-Mabine referred Mrs. Outterbridge to the emergency room for problems with her hemoglobin, hematocrit, and pulse oximetry; Mrs. Outterbridge had significant marked anemia and a hemoglobin level around six or seven, which is half of a normal level. In the hospital, Mrs. Outterbridge received a blood transfusion which relieved her chest pain. N.T. Feb. 21, 2024, P. 82, L. 10-12. Staff performed an EKG on her, and the computer reported a septal infarction of unidentified age. N.T. Feb. 13, 2024, P. 62, L. 6-22. The EKG was also read by cardiologist Dr. Rodriguez who disagreed with the "computer read" and reported that Mrs. Outterbridge had normal sinus rhythm and her blood tests for clots and cardiac enzymes were reported as normal. N.T. Feb. 13, 2024, P. 52, 61-63.[1]

---

[1] Plaintiff's expert cardiologist, Dr. Ash, disagreed with both Dr. Shorten's and Dr. Rodriguez's interpretation of Mrs. Outterbridge's EKGs read in 2009 and 2013.

2

In June 2014, Mrs. Outterbridge was admitted to the emergency room at Chestnut Hill Hospital for sharp chest pains which she reported had lasted for three days. Emergency room doctors ordered another EKG and by chest x-ray found that she had a normal "cardiomediastinal silhouette," meaning dimensions of the heart appeared normal. Mrs. Outterbridge was diagnosed with hypokalemia (low potassium) and discharge instructions advised her to follow up with her *gynecologist*, Dr. Thomas-Mabine, within five to seven days.

At Mrs. Outterbridge's next visit with Dr. Shorten in 2014, she was pregnant, and she denied any shortness of breath or chest pain and was reported to have a normal heart rhythm. There were no reports of chest pain or shortness of breath throughout the remainder of her pregnancy. On August 10, 2015, Mrs. Outterbridge saw Dr. Weiss following chest pain that she stated lasted two weeks which was relieved with the antacid "Tums." Plaintiff's expert cardiologist testified that indigestion can "absolutely" cause pain in the chest. N.T. Feb. 14, 2024, AM, P. 28, L. 12-15. This was the last complaint of chest pain that Mrs. Outterbridge had before she passed.

On July 7, 2017, Dr. Beddis saw Mrs. Outterbridge for fatigue and after labs, found her hemoglobin to be 6.5. Dr. Beddis referred Mrs. Outterbridge to a hematologist, Dr. LaPar, and there she complained of "mild occasional lightheadedness, with mild intermittent fatigue." N.T. Feb. 26, 2024 AM, P. 96, L. 7-9. Plaintiff's expert cardiologist admitted Mrs. Outterbridge's severe iron deficiency anemia could cause light-headedness. N.T. Feb. 13, 2024 PM, P. 56, L. 8-13.

On May 10, 2018, the morning of a scheduled gynecologic surgery, Mrs. Outterbridge was found unresponsive in the bed that she shared with her husband and two-year-old daughter and was unable to be revived. The Philadelphia Medical Examiner's Office, where her autopsy was performed, listed her cause of death as dilated cardiomyopathy. Plaintiff Darren Outterbridge

initiated this medical malpractice action by complaint on March 9, 2019 and this matter was tried before a jury from February 12, 2024 to March 1, 2024. At trial, Defendant's expert cardiologist, Dr. Elliot Gerber, and medical examiner forensic pathologist, Dr. Kevin Horn, disagreed with the Philadelphia Medical Examiner's cause of death and stated it was their belief to a reasonable degree of medical certainty that Mrs. Outterbridge did not die of the medical examiner's listed cause.

Plaintiff's primary care medicine specialist and primary care standard of care expert, Dr. Brian Ash testified that many times people are diagnosed with dilated cardiomyopathy as an "incidental finding" when, for example, "someone might go to the ER with abdominal pain that turns out to be an appendix, but the ER protocol is to do an *EKG which might show abnormalities*. N.T. Feb.12, 2024 P. 43. [emphasis added]. He continued, "So after the emergent situation has been dealt with, the appendicitis then dealt with, *the issue of the abnormal EKG that was found*, and subsequently, the cardiologist diagnosed the cause of the abnormal EKG to be some type of cardiomyopathy. Id. [emphasis added]. Throughout years of care by various doctors, including trips to the hospital for gynecologic issues and surgeries aimed to stop her severe gynecologic bleeding that caused marked and significant anemia, Mrs. Outterbridge did not have abnormal EKG readings. She did have a low level (grade two or three) heart murmur, but Dr. Ash also testified that Mrs. Outterbridge's anemia could have caused that. N.T. Feb. 13, 2024 P. 17. Dr. Ash also agreed that Mrs. Outterbridge's low potassium could cause symptoms of weakness and abnormal heart rhythms. N.T. Feb. 14, 2024 AM, P.15, L. 20-25.

Dr. Gerber, Defendants' expert cardiologist, also testified that Plaintiff's very severe anemia would cause chest pain, difficulty in the heart and the rest of the body and organs getting enough nutrients and oxygen, as well as fatigue. N.T. Feb. 27, 2024, P. 44-45, L. 20-19. Dr. Gerber

4

testified that Mrs. Outterbridge's heart murmurs generally occurred during periods that she was anemic and as her hemoglobin increased, her murmur was no longer detectable, which ruled out a cardiac cause of her heart problems. N.T. Feb. 27, 2024 PM, P. 3-5.

Dr. Gerber testified to a reasonable degree of medical certainty that he did not believe the Defendant doctors caused harm or increased the risk of harm to Mrs. Outterbridge in their treatment of her because she had infrequent complaints of chest pain that were remedied either with antacids or osteopathic manipulation of her ribs. N.T. Feb. 27, 2024 PM, P. 17, L. 3-19. He testified that Mrs. Outterbridge complained to doctors of five instances of chest pain over a period of eleven years which was "never typical of heart pain." Id. He testified that Mrs. Outterbridge's complaints of chest pain were never consistent with a cardiac source because "you can't create heart pain by touching the chest wall, by palpating it. Heart pain does not go away with antacids. Heart pain, when it comes, if you have chest pain and it comes, it doesn't disappear for two, three years at a time, because the source of the heart pain has been there all the time." N.T. Feb. 28, 2024, P. 69-70, L. 1-7. Further, he testified that she could not have had dilated cardiomyopathy from 2007 to 2018 without there ever being a change in the pattern of her EKG and that her heart, which measured 400 grams on autopsy, was within a normal range. Id., P. 70, L. 8-14. He also testified that the chambers of her heart were normal in size, contradicting the idea that she could have dilated cardiomyopathy because by its very definition, the heart needs to be dilated. Id. at 71.

Dr. Shorten, Dr. Weiss, and Dr. Beddis all testified that they believed that they did not breach the standard of care by not referring Mrs. Outterbridge to a cardiologist for her complaints of chest pain because in looking at the patient as a whole, they did not believe any of her complaints were cardiac in nature. Dr. Beddis testified that all of Mrs. Outterbridge's EKGs were normal. Dr. Shorten testified that when she treated Mrs. Outterbridge, she did not have any symptoms of dilated

5

cardiomyopathy like palpitations, shortness of breath, edema, or fatigue. N.T. Feb. 21, 2024 AM, P. 85, L. 17-22. Dr. Weiss testified that her risk factors for heart disease were low—she was not smoking, was not overweight, her cholesterol was not high, and her blood pressure was controlled. N.T. Feb. 27, 2024 PM, P. 103, L. 2-6. Although she had a brother who died from a heart-attack, her other six siblings and parents were alive, and he believed her chest pain was musculoskeletal and not heart disease. Id.

Credibility of witnesses is within the sole province of the jury[2] and on March 1, 2024, the jury returned a verdict in favor of the defendant doctors, finding that Dr. Shorten, Dr. Weiss, and Dr. Beddis were not negligent in the care and treatment of Yhvetta Outterbridge. On March 11, 2024, Plaintiff filed a post-trial motion for new trial. Defendants answered in opposition, and on April 11, 2024 this Court heard oral argument and denied Plaintiff's motion in its entirety. On May 1, 2024, Plaintiff filed a *praecipe* to enter judgment on the verdict and on May 3, 2024, Plaintiff filed a Notice of Appeal to the Superior Court. On May 7, 2024, this Court issued a 1925(b) Order and on May 17, 2024, Plaintiff timely raised five issues on appeal. On July 31, 2024, this Court issued Plaintiff a subsequent 1925(b) order asking for more specificity regarding the first issue on appeal. Plaintiff complied and on August 5, 2024, returned the following statement of matters complained of on appeal (with the clarification for issue one put in footnote 4 below):

1. The Trial Court committed reversible error by improperly precluding Plaintiff's counsel from impeaching Defendants' expert cardiology witness, Eliot Gerber, MD, and Brent Beddis, DO, with standard literature, a Heart Rhythm Society/American Heart Association

---

[2] See e.g., *Keating v. Belcher*, 384 Pa. 129, 133, 119 A.2d 535, 538 (1956)('It is the exclusive province of the jury, not the court, to decide all the facts, the inferences therefrom, the credibility of the witnesses and the weight and effect to be given to all of the testimony.')

Expert Consensus Statement, that Plaintiff's expert had already authenticated, and which contradicted Defendants' witnesses' testimony.[3]

2. The Trial Court erroneously permitted Defendants to argue, over Plaintiff's objections, that they were vindicated by the actions of plaintiff-decedent's medical providers in other specialties who did not refer plaintiff-decedent to a cardiologist, including her treating psychologist, creating the prejudicial and misleading impression that plaintiff-decedent's treating gynecologist and other specialists agreed that Defendants met the standard of care by not referring plaintiff-decedent to a cardiologist, and the Court further precluded Plaintiff from introducing testimony that refuted Defendants' argument, in particular testimony from plaintiff-decedent's treating gynecologist that if a patient needed an outpatient workup with a cardiologist she expected the patient's primary care physician would manage that referral.

3. The Trial Court improperly denied Plaintiff's request for Abington Memorial Hospital to appear on the verdict sheet for the negligence of its staff despite Defendant themselves offering testimony that its clerical staff may have negligently failed to follow protocol and provide the defendant physicians with important faces from outside sources regarding plaintiff-decedent's cardiac condition thereby permitting the jury to conclude that none of the physician defendants on the verdict sheet were liable for Plaintiff's harm.

4. The Trial Court improperly granted Defendants' motion *in limine* and precluded Plaintiff's counsel from referring to or cross-examining the defendant doctors about their deposition testimony that their real-time, contemporaneous, rationale for assessing plaintiff-decedent's cardiac risk factors as being low despite her having a brother who suffered from a premature sudden cardiac death was that they thought the decedent's brother could have been a drug user.

5. The Trial Court erroneously denied Plaintiff's motion *in limine* and permitted Defendants to introduce irrelevant questioning and evidence that plaintiff-decedent's husband, Mr. Outterbridge, continued to treat with Defendants' primary care practice group after his

---

[3] The trial court precluded Plaintiff's counsel from cross examining Defendants' cardiology expert, Eliot Gerber, MD, and Brent Beddis, DO, with an Expert Consensus Statement ("Expert Consensus Statement") published by the Heart Rhythm Society/American Heart Association in 2013 related to screening and testing of first-degree relatives of victims of unexplained sudden cardiac death at a young age. Plaintiff's expert, Dr. Hayek, authenticated the Expert Consensus Statement as standard within the field. N.T. 2/20/24 at 75-76. Dr. Gerber testified that there was no reason for Mrs. Outterbridge to undergo echocardiogram, even if referred to a cardiologist. N.T. 2/27/24 PM at 63-64. Plaintiff's counsel sought to impeach Dr. Gerber with the Expert Consensus Statement indicating that Mrs. Outterbridge's family history of sudden unexplained cardiac death at a young age required an echocardiogram, but the trial court precluded this use of the treatise for impeachment. N.T. 2/28/24 AM at 35:12-51:16. The trial court made clear that its ruling was based on relevance and "that Dr. Gerber didn't agree that it was authoritative." Tr. of 4/11/24 Post-Trial Motion Argument at 69-74.

Further, Dr. Beddis, who Defendants represented to the jury was an expert, opined that it was "never indicated" for him to obtain an echocardiogram for Mrs. Outterbridge, that the medical literature did not require such, and that he provided Mrs. Outterbridge with "good care." See, e.g., N.T. 2/28/24 PM at 16-17. Dr. Beddis admitted that the Expert Consensus Statement was the kind of resource that primary care physicians generally can go to and would use. N.T. 2/26/24 AM at 18:5-15. However, the trial court precluded impeachment of Dr. Beddis with the Expert Consensus Statement. N.T. 2/26/24 AM at 6:25-15 ("The objection is sustained."); N.T. 2/26/24 AM at 18:20-21.

7

wife's death, and thereby permitted Defendants to misleadingly and prejudicially argue that Mr. Outterbridge was "lying" about this collateral and irrelevant issue, and that Plaintiff's entire case was untrustworthy and unmeritorious.

For the foregoing reasons, these five claims of legal error presented by Plaintiff's counsel are unmeritorious and should be denied in their entirety.

Plaintiff's first issue on appeal, that this Court committed reversible error by precluding Plaintiff's counsel from impeaching Defendants' expert cardiology witness, Elliot Gerber, MD, and Defendant Brent Beddis, DO, with an article "The Expert Consensus Statement on the Diagnosis and Management of Patients with Inherited Primary Arrhythmia Symptoms" by the Heart Rhythm Society and endorsed by the American College of Cardiology Foundation and the American Heart Association, should be deemed meritless as this Court's decisions were in accordance with the Pennsylvania Rules of Evidence. First, Plaintiff was precluded from questioning Dr. Gerber about the article because it was not relevant to the issues at trial. The article articulated guidelines for *cardiologists* when managing a patient who is referred to them who has a family history of heart issues and what a cardiologist could/should do when learning of a patient who has a family member die of an "unspecified" cardiac condition, is not relevant as to what a primary care physician could/should do to render good care.

Next, Plaintiff was precluded from questioning Dr. Beddis with this article because it was not properly authenticated— it is outside of his specialty, was not authenticated as relied on as standard in his field, and he did not personally rely on it. Fundamentally, for evidence to be admissible, it must be relevant. *Pa.R.E. 402.* Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. *Pa.R.E. 401.*

8

Additionally, our rules of evidence do not recognize a hearsay exception for a learned treatise. *See Pa.R.E. 803(18).*[4] A "learned treatise" is any textbook, published work, or periodical that has been accepted as authoritative or as reliable authority by members of a specific professional community. *See Ohlbaum on the Pennsylvania Rules of Evidence* 703.15[3]. Under Pennsylvania law, the contents of a learned treatise offered at trial to establish principles or theories is inadmissible hearsay, an extrajudicial declaration offered to prove the truth of the matter asserted. *See Aldridge v. Edmunds*, 561 Pa. 323, 750 A.2d 292, 296 (2000). Experts may rely on authoritative publications in formulating their opinions, and, to a limited extent, our courts permit experts to briefly reference materials to explain the reasons underlying their opinions. *Id.* at 297. While such materials are not admissible, an expert may be impeached with statements contained in a text or publication deemed authoritative or ***reliable by him or other experts in the same field.*** *See McDaniel v. Merck, Sharp & Dohme*, 367 Pa.Super. 600, 533 A.2d 436 (1987).[emphasis added], *Pa. R. Evid. 803(18)*.

Further, a fact witness's credibility may be challenged on cross-examination with respect to any *publication **in the field that he considers generally reliable***. *Crespo v. Hughes*, 167 A.3d 168, 182 (Pa.Super. 2017) (citing *Majdic, supra* at 339) [emphasis added]. *See also Burton-Lister v. Siegel, Sivitz & Lebed Assocs.*, 798 A.2d 231, 239 (Pa.Super. 2002) (finding it permissible to cross-examine defendant physician with a publication that he deemed authoritative). Dr. Beddis

---

[4] Rule 803. Exceptions to the Rule Against Hearsay--Regardless of Whether the Declarant Is Available as a Witness 18) Statements in Learned Treatises, Periodicals, or Pamphlets (Not Adopted)

*Comment:* Pennsylvania has not adopted F.R.E. 803(18). Pennsylvania does not recognize an exception to the hearsay rule for learned treatises. *See Majdic v. Cincinnati Machine Co.*, 370 Pa. Super. 611, 537 A.2d 334 (1988).

Regarding the permissible uses of learned treatises under Pennsylvania law, see *Aldridge v. Edmunds*, 561 Pa. 323, 750 A.2d 292 (Pa. 2000).

*Pa.R.E. 803(18).*

testified in this trial as a fact witness, despite defense counsel's reference to him as an "expert" in opening statements.[5]

The law is well settled that the Superior Court's "standard of review of an evidentiary ruling made by the trial court is extremely narrow." *Capoferri, supra* at 143. "The admission or exclusion of evidence is a matter within the sound discretion of the trial court, which may only be reversed upon a showing of a manifest abuse of discretion. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Potochnick v. Perry*, 861 A.2d 277, 282 (Pa.Super. 2004).

In *Charlton v. Troy, 236 A.3d 22, (Pa.Super. 2020)*, the Superior Court found the trial court committed an extremely prejudicial error and mandated a new trial following the trial court's allowance of counsel utilizing a neurology textbook to impeach the defendant obstetrician, Dr. Troy. The Superior Court found that without Dr. Troy's acknowledgment that the text was a standard or authoritative work in the field, "no foundation was laid that would establish the *Volpe* textbook as a learned treatise for the limited purpose of impeaching Dr. Troy."

Further, the article discussed head position during delivery—which was the exact issue on trial—and whether Dr. Troy breached the standard of care of an obstetrician and harmed the baby he delivered when he did not use ultrasound technology to make sure the neck was flexed during delivery to avoid snapping the dura and causing paralysis—the ultimate injury to the Plaintiff. The

---

[5] Defense Counsel: You are going to hear from expert witnesses. As a point of fact, the three doctors I have the privilege to represent in this case, Dr. Beddis, Dr. Weiss, and Dr. Shorten, they are experts too. Just means you're a doctor and you practice and that's what you do for a living. And they are going to explain to you, in their own words, why they absolutely complied with the standard of care in this case. And I agree, absolutely, you're going to get all your law in this case from His Honor. N.T. Feb. 12, 2024 AM P. 53. L. 16-25, P. 54, 1-3.
This Court corrected Plaintiff's misunderstanding regarding Defense counsel's statement that the defendant doctors were experts. See. N.T. Feb. 26, 2024 AM, P. 11.

10

Superior Court stated that "[i]t is beyond cavil that the Volpe text was used as substantive evidence, *i.e.*, for the truth of the matter asserted. The reading of excerpts from the text invited the jury to view the 'snapping' or 'popping' sound heard during G.C.'s delivery both as evidence of Dr. Troy's negligence and as proof that he caused the injury. *See Burton-Lister, supra* at 239 (finding error where a publication was used to cross-examine a party physician by reading in portions as this use was "an implicit invitation to the jury to view the substance of the material as true")." *Charlton v. Troy*, 2020 PA Super 170, 236 A.3d 22, 40 (2020).

This Court did not commit the same error. This Court first precluded Plaintiff from questioning fact witness Dr. Beddis, a family care practitioner, with evidence of what is standard for a cardiologist to do as published in an article in the cardiology journal Heart Rhythm Society because Dr. Beddis, or any other primary care physician testifying in this trial, did not establish this journal as generally reliable in his field as a primary care physician and Dr. Beddis did not state that *he* was familiar with the article or the journal in which it was published.

At side bar, Mr. Ross advised the Court that he wanted to ask Dr. Beddis if a study done in collaboration with the American Heart Association is the kind of standard literature and study that would be within the field of what a primary care physician like himself would look at." The Court inquired with Plaintiff's counsel further if it was "within the standard of care that he must follow. Is that what you're going to ask him." Mr. Ross answered that it was his intention to ask him "with respect to primary care, is it standard?" N.T. Feb. 26, 2024 AM, P. 13, L. 15-17.

In accordance with Pennsylvania law regarding questioning a fact witness, the Court advised Plaintiff's counsel that if the proper foundation was laid, meaning that Dr. Beddis was familiar with that Journal and stated that it was generally reliable in the field of primary care, Plaintiff's counsel could question Dr. Beddis about this article. The Court further advised

11

Plaintiff's counsel that if Dr. Beddis, in the alternative, rejected knowledge of the study and states that it is not what he relies on to establish general practice for good care to his patients in stating something like, "I'm not aware of the study, and, I don't consider it, I don't consider it in my field of practice, and the studies that I do -- I mean, the studies that I review and the journal that I utilize -- I don't know if he would say this, but they set the standard of care of how I treat patients with cardiac issues. I'm not aware of this and as far as I'm concerned this has no bearing on how I treat patients. Then [Plaintiff's counsel] can't ask him about it." Id., P. 13-14. Returning to open court, Plaintiff's counsel's questioning of Dr. Beddis proceeded as follows:

Q. Now, in terms of you trying to stay abreast of the literature with respect to cardiac issues, the management of your patients as a primary care physician, the management of patients with cardiology issues, is this the kind of literature that is sort of a standard piece of literature for even a primary care physician to read, to understand cardiac issues, in particular issues having to deal with sudden cardiac death in a young person? Is this the kind of literature that you would look to that physicians like yourself, in primary care medicine, would look to?

A. **I mean, I don't think that I would read this specifically. I probably wait for it to be mentioned in the family medicine article that would guide us in how to, you know, manage these patients. <u>But we can say that it's a resource to be used, but it's not, no one is saying it's the standard.</u>**

Q. I'm not getting there yet. I'm just asking you, is it the type of resource that is used by primary care physicians in general, to make themselves aware of the management of cardiac issues; and specifically, the management of a patient who has a first-degree relative who has died of sudden cardiac death. **<u>Is it the kind of resource that primary care physicians generally can go to and would use? That's what I'm asking.</u>** I'm not getting to standard of care yet.

A. **<u>Certainly it's something we could use, sure.</u>**

MR. ROSS: May I proceed, Your Honor?

THE WITNESS: **<u>Along with many other resources.</u>**

Id., P. 17-18.

Defense counsel objected and this Court instructed Plaintiff's counsel to lay more of a foundation before proceeding to question Dr. Beddis about the article because he stated that he would not read this specifically, and that it was the *type* of resource that *could* be used in the field with other resources but did not answer affirmatively, within this Court's discretion, to establish

12

that this resource was generally reliable and he had also just testified in a prior moment that it was not the standard in his field. Plaintiff's counsel's questioning continued:

**Q.** I'm asking you if this is the type of literature that primary care physicians, the type of just standard literature that primary care physicians would look to in order to keep themselves abreast of these types of issues? And I'm not asking if you in particular would read it, but people in your specialty. Is it the kind of literature they would look to?
**A.** **I can only comment on myself.**
**Q.** I'm sorry?
**A.** **I guess I can only comment on myself. I don't know.**
**Q.** Was there cardiology literature that you would look to keep yourself knowledgeable and current on cardiology issues that would pertain to your clients? Was there cardiology literature that you would look to, separate and apart from family physician literature? Was there cardiology literature? And if so, what was it?
**A.** **I guess not separate specific cardiac resources. I would do it all under family medicine resources.**
**Q.** I see. So you wouldn't look at any cardiology resources?
**A.** Maybe I would --
**Q.** If so, what?
**THE COURT**: Let him finish the answer.
**THE WITNESS**: I don't know off the top of my head.

Id., P. 18-19.

Dr. Beddis named "the American Heart Association, the American College of Cardiology, anything" and stated "In our AFP [family practice] journal they publish articles from them, so I would say the AFP journal" as cardiology specific resources that he would use to keep himself knowledgeable and current on cardiology specific issues. N.T. Feb. 26, 2024, AM, P.20, L. 4-14. Plaintiff proceeded to question the witness and the Court believed Plaintiff was trying to back-door this article into evidence by just asking about medical literature in general and advised Plaintiff's counsel how to ask the question to elicit the information he was seeking. Instead, Plaintiff's counsel moved on to discussing a different article that was published in a Journal that Dr. Beddis stated that he relies on for information. Accordingly, it was Dr. Beddis' responses to Plaintiff's questions, in accordance with Pennsylvania law, that precluded Plaintiff's counsel from asking Dr. Beddis further detailed information regarding an article in a cardiology journal with

13

which Dr. Beddis was unfamiliar and was not established as generally relied on in his field as a primary care physician.

It would have been an abuse of discretion if this Court would have allowed Plaintiff to question Dr. Beddis regarding an article that he was unfamiliar with, in a medical journal that was not established to be relied on as standard in his field of primary care. This Court advised Plaintiff correctly that Dr. Beddis, as a fact witness, could be questioned about articles that are generally relied on in their respective fields, but Plaintiff's counsel could not establish through testimony that this article was just that.

Next, Plaintiff's counsel argues that they were precluded from "impeaching an expert with standard literature in his field," which Plaintiff states his cardiologist Dr. Hayek qualified as such.[6] This Court acknowledges that an expert can be impeached with standard literature in his field, however, to be permissible, that evidence must still be relevant to the issue at trial, as relevancy is the fundamental consideration regarding admission of evidence. *Pa.R.E. 607.*

Plaintiff's counsel correctly stated that this Court focused on relevancy as the reason for precluding him from improperly questioning Dr. Gerber regarding literature that Plaintiff believes establishes the standard of care for a cardiologist regarding finding out that a patient's relative died under the age of fifty years old from an unexplained cardiac condition. As this Court explained to Plaintiff's counsel, the established standard of care for a cardiologist is not the same as the standard of care for a primary care physician. *See 40 P.S. § 1303.512, see also Wexler v. Hecht,* A.2d 95 (Pa.Super. 2004)(finding that the trial court did not abuse its discretion in declining to hear testimony of a podiatrist regarding evidence of an orthopedic surgeon's standard of care) and

---

[6] This Court notes that Dr. Gerber also referred to this article in one of his expert reports.

14

evidence established at trial was that Plaintiff's decedent's brother <u>did not</u> die of an "unexplained" cause—he died of a myocardial infarction, or heart attack.

This Court heard and considered extensive argument from Plaintiff's counsel regarding his desire to impeach Dr. Gerber with the Expert Consensus Report on the Diagnosis and Management of Patients with Inherited Arrhythmia Symptoms and ruled that this impeachment was irrelevant and thus inadmissible under Pennsylvania law.

| | |
|---|---|
| THE COURT: | Let me say, if I'm not mistaken, this is an article that Dr. Gerber indicated he referred to in one of his reports and he indicated he relied at least in part upon this report in forming the basis for his opinion. Correct? |
| MR. TROY: | Not quite, Your Honor. What he was doing, both Dr. Gerber and Dr. Hayek wrote about standard of care in their reports. **And where Gerber mentions it in his response here, he is responding to Hayek about standard of care.** And to be clear, here's the line he is about to read, which is about – |
| MR. ROSS: | I'm not going to do that. I know what you're getting at. I'm going to do it in this fashion, and I don't think you will have an objection to it. First of all, I will show the two definitions here, one, to show he was wrong in terms of the definition he gave to the jury yesterday. That's what I'm doing with Items 1 and 2. |
| THE COURT: | About the sudden unexplained death? |
| MR. ROSS: | Correct. That's exactly right. And then, **what I'm going to do is do exactly what Dr. Hayek said, which is, if a patient like this is referred to me as a cardiologist, here's what I have to do. So when I go here, to the point that you're circling there, Paul, I'm going to say, now, Dr. Hayek has told this jury, if a patient with this family history is referred to him as a cardiologist, these are the things he has to do. And he said there are guidelines out there that require him, as a cardiologist, to do these things. I'm going to say to the witness, from your vantage point as a cardiologist, when a SUDS patient comes to you, this is what this consensus statement says you as the cardiologist have to do. And that's relevant in this case.** |
| THE COURT: | **I don't understand the relevance of that because there is no cardiologist being sued here.** |
| MR. ROSS: | The relevance is causation. Because Dr. Hayek says absolutely, 100 percent, when a patient gets referred to me as a cardiologist, I have to do an echo. That's what this says that the cardiologist has to do. **I'm not going to comment on what the primary care doctors have to do. I'm going to say to him, you as a cardiologist, they have recommendations in here. In fact, Dr. Beddis said these don't even apply to us. He said these are cardiology things.** |

15

| | |
|---|---|
| THE COURT: | **Right.** |
| MR. ROSS: | And I will say, establish with him that's what has to be done when the patient is sent over there. |
| THE COURT: | To what end? |
| MR. ROSS: | What do you mean? |
| THE COURT: | **What does it matter what a cardiologist should or should not do?** |
| MR. ROSS: | Because part of Hayek's opinion is, had the patient been referred to a cardiologist, an echo absolutely would have been done because it has to be done, under the guidelines. That's why it's relevant. |
| MR. TROY: | If I may, Your Honor, when you look at this that he is about to read, the premise is, if you have a first-degree relative who died of SUDS, sudden unexplained death syndrome, and the relative should have been sent to a cardiologist and should get this workup, the issue is, we have all seen the brother's autopsy report multiple times. He did not die of sudden unexplained death syndrome. It was a very definite diagnosis that he had of coronary this and that and the other thing. |
| THE COURT: | Atherosclerosis disease. |
| MR. TROY: | What a cardiologist would do getting a referral of a relative of a SUDS victim is of no bearing, moment or probative value to the jury. |
| MR. ROSS: | It is for the reasons I said. He was a SUDS victim when they were treating him. |
| THE COURT: | Who was? |
| MR. ROSS: | **The brother. He was a SUDS victim when they were treating him because they didn't know what caused his sudden cardiac death. It was unexplained. I established that already with Dr. Beddis. That's in his testimony. But we can debate that, on redirect. He can try to establish he is not a SUDS victim.** |
| THE COURT: | Let me preface, I believe both of you are much smarter than me. My question is much more basic. <u>My question is, what is the relevance of what a cardiologist would do when someone is referred to them? The fact of the matter is, and I know you're putting up your hand, but what is the relevance of what a cardiologist should or should not do or would or would not do when a patient is referred to them, since you're not suing the cardiologist, you're suing the primary care physicians?</u> |
| MR. ROSS: | The relevance is causation. **We have to establish, it's our burden to establish here, if the patient had gone to a cardiologist, she would have gotten an echo. That's our burden. That's why this is super relevant. It is extremely relevant. I have to prove to this jury that if she had gone to a cardiologist she would have gotten an echo.<u> It is part of what I must prove to the jury. If the jury believes, hey, if she had gone to a cardiologist, they still wouldn't have done an echo, we lose.</u>** This, that is critical evidence and it's my burden to establish that with this jury. And that's exactly what Dr. Hayek said. And now I can establish with this witness that what Dr. Hayek said is 100 percent correct. Because this is what the cardiologists need to do. |

16

MR. TROY: SUDS is a diagnosis. And we already established with this witness and another one that SUDS is something a pathologist does all their work and says, I don't know. And it's diagnosed sudden unexplained death syndrome. That never happened with Nathaniel Woodard. That autopsy report did reach a conclusion. The argument counsel is making is that my doctors had not seen that autopsy report, therefore somehow that means a diagnosis of SUDS. That idea is absurd because what they were told was he had a heart attack. The reality was there was an autopsy report saying he died of coronary —

MS. SHOWALTER: Hypertensive atherosclerosis.

MR. TROY: **Thank you. That's the reality. Even in the world they are in they were told he had a heart attack. Absent any evidence that these doctors were told he died of SUDS, this has no probative value to a jury.**

MR. ROSS: It does because, first of all, the definition he just gave of SUDS, the one the witness gave, is wrong. This document proves that it's wrong. What he said yesterday is incorrect. The definition he gave is for SADS, S-A-D-S.

THE COURT: You can ask him that.

MR. ROSS: **That's where I started, but I want to go to the point that is being raised here. It's my burden to show that she absolutely would have gotten an echo had she had been sent to a cardiologist.**

THE COURT: **If her first-generation relative died and the diagnosis was SUDS?**

MR. ROSS: **Correct.**

THE COURT: **Which wasn't the case.**

MR. ROSS: It was the case. It absolutely was the case. Here, if you look at the definition of SUDS, here it is that an unexplained death occurring in an individual older than one year of age is known as sudden unexplained death syndrome. SUDS. That's him.

THE COURT: But it wasn't unexplained.

MR. ROSS: It was. There was no explanation for what caused his MI. If you look at the chapter here --

THE COURT: **Correct me if I'm wrong. There was no explanation at the time that the primary care physicians -- of what caused his heart attack. But he died of a heart attack.**

MR. ROSS: **I know. This article actually deals with that scenario. It's saying for people who die of a cardiac cause, unexplained cardiac death, that's where they start in the article.**

THE COURT: Let me ask you this. Someone who dies of a heart attack fits the category of someone who dies an unexplained cardiac event.

MR. ROSS: Yes. Absolutely, if you look at the article, it makes it clear that is true.

THE COURT: Being a judge, I think that is illogical. If they say, my grandfather, if someone in the family died of a heart attack, what did he die of, he died of a heart attack. What did he die of, I don't know, something that can't be explained, isn't that two different things? I'm asking you.

MR. ROSS: In this situation, it's not. Because what they are saying here is, they are saying, listen, we are talking about everybody who dies of a cardiac condition. This entire section is dealing with everybody who dies of a

17

cardiac condition. He died of an MI. That's the information that they received.

THE COURT: Right.

MR. ROSS: That's where this starts. He fits in this category. He was someone who died of what they called a sudden cardiac death. He died of an MI suddenly. So he fits there, for starters. Number two, if you don't have an explanation for the cardiac death that the person suffered, you are a SUDS. That's what this says. By the way, if they disagree with that, they can make that disagreement with the jury. That goes to the weight and sufficiency.

THE COURT: Do you want to respond?

MR. TROY: **It's sudden unexplained death, not sudden unexplained MI, or sudden unexplained hypertrophic cardiomyopathy. There was a cause of death for the brother in reality and there was a cause of death for the brother explained to these physicians. It's not of probative value to the jury. It's a different topic.**

MR. ROSS: Look at the title. Unexplained sudden cardiac death right up here. Unexplained sudden cardiac death. That's what he had. Unexplained sudden cardiac death.

MR. TROY: **There are lots of cardiac deaths that they can't figure out what did it. Nathaniel Woodard's pathologist did figure out what did it and the family told the doctors —**

THE COURT: **My understanding from the autopsy was that he died of hypertensive and coronary atherosclerotic disease. He had plaque in his arteries such that his arteries were occluded up to 50 percent. Correct?**

MR. ROSS: Yes.

THE COURT: **That is not unexplained.**

MR. ROSS: They didn't know it at the time. They didn't have the autopsy. That is the whole point. They didn't have the autopsy.

MR. TROY: That he had MI. They had myocardial infarct.

MR. ROSS: **The whole point of that is, they did not have the autopsy. It was unexplained to them.** I went through this with Dr. Beddis. I have his testimony on it. He actually said it was unexplained, and if they had -- let me finish. If they have a contrary argument to this, they can raise it with the jury. I'm hearing no reason why they can't raise a contrary -- this witness, by the way, he can disagree. He can say this is not SUDS. Because I'm going to ask him at the end of the day, if it is SUDS, an echo is required. But I'm entitled to read the definition of SUDS and say to him, if it's SUDS, an echo is required. Because my expert has said it's SUDS. He can disagree. He can say it's not SUDS. But I'm entitled to establish with him.

THE COURT: What is the question you propose to ask this witness?

MR. ROSS: The first couple of questions I'm going to do is I'm going to read the definition of SUDS and of SADS.

THE COURT: From this article?

MR. ROSS: From this article. It's right there, one and two. I will read those definitions. I will establish what SUDS is and then I'm going to say to him, if in fact the brother's death fits under SUDS, according to the article, according to this

18

article, a cardiologist would be required, then, to do an echo. That's going to be my question. By the way, if you want me to, I will even ask him, do you believe it fits under SUDS? He can say whatever he wants. I don't care. My expert has a different opinion. He says it does fit under SUDS. I'm entitled to say, if, if in fact his death fits under SUDS, a cardiologist is required by this, I will read exactly what it says, that requires a cardiologist to do an echo.

MR. TROY: Counsel's position is that when something is not probative and not relevant, he can use it anyway and the witness can then say it's not relevant. That's why, thank goodness, we have a gatekeeper. It is undisputed that what these doctors were told is he died of an MI. There was a cause of death. The issue is not whether there was a known cause of the MI. For them to make that argument would be to say that every time a doctor doesn't have an autopsy report of a first-degree relative it's a SUDS case.

THE COURT: And he should send, the primary care physician should send the first-degree relative for an echocardiogram.

MR. TROY: He wants to use that, and it's of no relevance, number one, and then, number two -- that's enough. It's not connected.

MR. ROSS: Two things, Judge. Number one, Dr. Hayek said his death fits the definition of SUDS. And as a SUDS death, if the patient is sent to him, he is required to do an echo. That came right out of his mouth from the witness stand.

THE COURT: **I heard enough for both. What I will do is sustain the objection, but I will allow you to ask this witness if he believes that the death of the brother fits the definition of SUDS.**

MR. ROSS: **I know what he's going to say. He's going to say no.**

THE COURT: **Then the question is not relevant.**

MR. ROSS: **Why can't I impeach him? I have an article that impeaches that. This article literally impeaches that. He is allowed to say that and I'm not allowed to impeach him? He raised it. He actually raised it in his testimony yesterday.**

MR. TROY: **What he said in his testimony was that Mrs. Outterbridge, not her brother; if the autopsy was done properly, it would have ended up as a sudden unexplained death. This is different. This is saying the brother was a, or they are trying to argue, the brother was a sudden unexplained death, when my doctors had an explanation that the death was caused by an MI.**

THE COURT: **I will sustain the objection. I will allow you to ask that question. If he says no, I want you to move on.**

MR. ROSS: Can I perfect what my position is?

THE COURT: Yes.

MR. ROSS: Thank you. So for causation purposes, I have an expert who has said the brother's death is consistent with SUDS, as it is defined by this consensus statement of experts, and that if a cardiologist receives a patient who has a first-degree relative that fits the category of SUDS, a cardiologist must, according to this expert has so testified to that and now I want to corroborate it with a defense expert. Not only that, I want to show that the defense

19

expert's definition is incorrect. And then I want to corroborate with a defense expert that if in fact the brother's death meets the criteria of SUDS, and there's a dispute on that in this case, I'm then entitled to cross-examine this witness and I want to cross-examine this witness to prove indeed it fits the definition of SUDS. And if so, if he is a SUDS victim, then the recommendation to the cardiologist is, you have to do an echo. I understand Your Honor's ruling. I have made my record.

- - -

(Resuming back in open court.)

N.T. Feb. 28, 2024 AM, P. 36-51.

While it is certainly proper to impeach an expert witness with a treatise or other form of authenticated literature when the expert or another expert in the field attests to the publication's reliability, that impeachment must still be relevant to the issue before the Court. ***Charlton v. Troy***, 2020 PA Super 170, 236 A.3d 22 (2020), *see **J.S. v. Whetzel***, 860 A.2d 1112 (holding that "a party may impeach an expert witness… [but] this inquiry must nevertheless be relevant to the main issue before the court.").

A fundamental and irreconcilable flaw with Plaintiff's desire to use "standard literature" in the field of cardiology is that the standard of care for what a cardiologist would do is not relevant to what a primary care physician would do and is not binding on a primary care physician. Here, whether an expert cardiologist believed that Mrs. Outterbridge needed an echocardiogram and whether the "standard of care" required a cardiologist who knew of a recent familial death due to an "unknown cardiac cause"[7] to send a patient for an echocardiogram was not relevant to the ultimate matter before the Court which was whether the defendant family care physicians breached their standard of care in not referring Mrs. Outterbridge to a cardiologist.

---

[7] Mrs. Outterbridge's brothers cause of death was not of an "unknown cardiac cause" as Plaintiff contended. His death certificated listed his cause of death as atherosclerotic disease.

20

Accordingly, it is respectfully requested that this Court's determination that neither Dr. Gerber nor Dr. Beddis could be questioned regarding an article that was precluded due to proper application of the Pennsylvania Rules of Evidence be affirmed on appeal.

In his second issue on appeal, Plaintiff argues that the Defendants were improperly permitted to cite the actions of medical providers who treated Mrs. Outterbridge and did not refer her to a cardiologist as evidence that the Defendant primary care physicians met their standard of care in also not referring Mrs. Outterbridge to a cardiologist, but that this Court erroneously precluded Plaintiff from questioning Mrs. Outterbridge's treating gynecologist regarding whether she expected a primary care doctor to refer Mrs. Outterbridge to a cardiologist.

In a medical malpractice action, a treating doctor may only testify as to his or her own experience without being presented as an expert witness. *Lykes v. Yates*, 77 A.3d 27 (Super. Pa. 2013). *See also* ***Brady v. Ballay, Thornton, Maloney Medical Assocs., Inc.***, 704 A.2d 1076, 1082 (Pa.Super.1997), *appeal denied*, 555 Pa. 738, 725 A.2d 1217 (1998) ("[A] physician who is also a defendant may testify as a fact witness on his own behalf ... so long as those opinions or inferences are rationally based on the witness's perceptions and helpful to a clear understanding of his or her testimony.").

Defendants were properly permitted by this Court to question the defendants and the plaintiff's decedent's treating physicians regarding actions that they did or did not take, and Plaintiffs were properly precluded from asking Dr. Lambert's[8] opinion as to what she would expect a doctor in a different medical specialty to do, as this Court found her expectation to be an opinion

---

[8] In addition to Dr. Thomas-Mabine, Dr. Lambert also rendered gynecologic care to Plaintiff's decedent Mrs. Outterbridge.

and she was not qualified by this Court to give a standard of care opinion for a primary care physician.

The line of questioning and opinion elicited by Dr. Lambert was as follows:

Q: "And from what we did look at, there is nothing that would suggest that you send her for cardiology workup. Is that right?"
A: "Yes."
Q: "Would it be your expectation that if a patient needs a workup with a cardiologist that's something the primary or family medicine doctor would send the patient for?"
A: "Yes."

N.T. Feb. 16, 2024, P. 23-24, L.3 24-8.[9]

Plaintiff's counsel relentlessly reiterated to this Court that Dr. Lamber's expectation of what a primary care doctor *would* do when presented with a patient who "needs a cardiology workup" is neither an opinion nor a standard of care opinion but instead relates directly to the defense of the defendants who specified that Doctor Lambert did not refer Mrs. Outterbridge to a cardiologist. Plaintiff asserted that Dr. Lambert's response related directly to *why* she did not refer Mrs. Outterbridge to a cardiologist. The Court explained:

| THE COURT: | **Mr. Ross, this is not a question of, did you expect the primary care physician to refer for cardiology workup. If that was the question, that would be fine.** |
|---|---|
| MR. ROSS: | **That's exactly the question.** |
| THE COURT: | No, it's not the question. Let me talk. My God. It is saying strictly, and this is what it says, "Would it be your expectation that if a patient needs a workup with a cardiologist --" that is something -- not that I found she does need a workup with a cardiologist, but I expected her primary care physician to do that. It's an opinion as to an event that may or may not happen in general, not specific to this case. So my ruling is my ruling. Thank you. |

N.T. Feb. 16, 2024, P. 28, L. 15-25, P. 29, L. 1-7.

---

[9] Defendants objected to line designation of Dr. Lambert's testimony page 44 lines 19 to 23.

Plaintiff's counsel re-iterated his point and view of the question and answer of Dr. Lambert:

MR. ROSS: Judge, I'm sorry, I don't want to cut you off –

THE COURT: Go ahead.

MR. ROSS: -- actually said exactly what you said you would allow, which is, if the patient needs a cardiology workup, that she would expect family medicine to take care of it. And we have talked here in this case and Dr. Ash has testified that this is a team approach, when various people are taking care of the patient. And he has said, those people don't do those things. They expect primary care to handle it. And he said primary care should handle it. This is directly to that point. Now, if she were to say, under the standard of care, primary care has to handle those things, I would understand. That is an opinion. She is not saying under the standard of care. She is simply saying it's her expectation. I'm not going to handle that. They are.

THE COURT: Okay. Do you want to respond?

MS. SHOWALTER: **I stand by my initial objection that an expectation is an opinion. She is being asked, what does she expect a primary care's job to do. She is not a primary care physician. She is a gynecologist. She is being asked what the standard of care is for a primary care doctor if the patient needs to be seen by a cardiologist. I stand by my objection. She is not a primary care doctor and can't render that opinion.**

MR. ROSS: I would say, Your Honor, she is part of this team. They all need to know what the expectation is. All the doctors who are on the team. And the point that she is making here is, no, not me. **I expect primary medicine is going to handle that.**

THE COURT: **If that's what she said, I would allow it, Mr. Ross. That's not what she said. She is asking in general.** Do you want to say something?

MR. ROSS: And it goes to the very heart of this case. If we are not allowed to defend it -- how do I argue, when I get up in the closing after defense counsel has said now already, maybe 30 times, this doctor and no other doctor referred her. To get to stand up in my opening and say, that's because they expect primary care to do it.

THE COURT: Sure, because that's the opinion of Dr. Ash, who was called as an expert and gave his opinions.

MR. ROSS: Say that again.

THE COURT: You can argue that because that's the opinion that Dr. Ash gave, as a standard of care for a primary care physician. Yes, you can argue that.

23

| MR. ROSS: | Here is the thing, Judge. I have an expert who they can say, don't believe their expert. I have it out of the mouth of the very doctor. I have it right out of the mouth of the very doctor. And it's consistent 100 percent with what Dr. Ash said. For me now not to be able to corroborate that with the exact testimony of the doctor, it is his opinion that the expectation is that primary medicine would handle it. Now I have direct evidence from the very doctor who they say didn't refer the patient who says the same thing as Dr. Ash. Therefore, it's no basis whatsoever for me not to be able to corroborate that. None. |
|---|---|
| THE COURT: | **There is a way the question could have been asked which would have been unobjectionable. It wasn't asked in that fashion and I sustained the objection.** Please let's move on. |

N.T. Feb. 16, 2024, P. 29-32.

...

| THE COURT: | **If the question, again, would have been, <u>if you think she needed a workup by a cardiologist, why didn't you refer her to a cardiologist,</u> and then if she would have responded to the question, that would be okay.** |
|---|---|

Id., P. 34, L. 17-22.

Plaintiff did not proffer Dr. Lambert as an expert witness and phrased his question to her in a way that exceeded the scope permissible for her testimony as a treating physician. Defendant objected and this Court properly precluded Plaintiff from eliciting this testimony.

In his third issue complained of on appeal, Plaintiff argues that this Court improperly denied his request to include Abbington Memorial Hospital on the verdict sheet because there was evidence presented against it where the jury could have imputed negligence to Abington Memorial Hospital for the actions of its clerical staff. Dr. Beddis testified that he could not say that he ever saw Mrs. Outerbridge's murmur classified as a grade three murmur because he did not hear it as that and did not see documents from a GI specialist who did hear her murmur and classified it as Grade 3, which was faxed to his office by a hematologist. N.T. Feb. 26, 2024, P. 74 -77. Accordingly, Plaintiff contended that he was entitled to argue to the jury the hospital was either negligent on behalf of the doctors if the documents were put into the bucket and the doctors

24

overlooked them or just did not see them or negligent on behalf of their staff if the documents were not brought to the doctor's attention. N.T. Mar. 6, 2024, P. 4-5.

Contrary to Plaintiff's contention, this Court was proper in denying Plaintiff's request because there was a profound lack of evidence against Abington's clerical staff making inclusion on these grounds improper *and* individual defendants already listed on the verdict sheet were employees or agents of Abington, meaning any verdict could be molded against Abington as well.

Further, Dr. Shorten, Dr. Weiss, and Dr. Beddis— the defendant primary care doctors at Wyncote Family Hospital— were all employees and/or agents of Abington Memorial Hospital. N.T. Mar. 1, 2024, P. 9-10 L.15-4. Accordingly, any determination of liability against any of the three defendants would have allowed for a verdict against Abington Memorial Hospital. The Appellant (Plaintiff) in *Seels v. Tenet Health System Hahnemann, LLC.,* 2027 PA Super 227, 167 A.3d 190, 208-09 (2017) made the same argument and the Superior Court characterized it as "absurd on its face." In *Seels*, the appellant argued "that the jury verdict form was defective in that it did not include other staff and agents working at Hahnemann Hospital caring for [the Plaintiff's decedent] during the relevant time such as nursing staff, other professionals, and residents who committed negligence." The Superior Court found the argument without merit when named defendant doctors were operating as agents of the hospital and accordingly the hospital was vicariously liable for their acts and counsel failed to identify in anything more than vague terms any other agents or employees who should have been named on the verdict sheet. Id.

Including Abington Memorial Hospital on the verdict sheet for negligence of its clerical staff, when there was no evidence offered to support the claim its staff was negligent, would have been erroneous. Testimony was never offered to support the conclusion that the staff was

25

negligent, but instead was mentioned in comment of how the office functioned and accordingly, it is respectfully requested that the Superior Court agree with this Court on appeal.

In his fourth issue on appeal, Plaintiff alleges that this Court improperly granted Defendants Abington Memorial Hospital, Suzzane Shorten, M.D., Kenneth S. Weiss, D.O., Brent C. Beddis, D.O., and Katie Garrelts, M.D.'s Motion *in Limine* to Preclude Reference to Alleged Drug Use, filed under control number 23124751.

The Superior Court has articulated that it follows an evidentiary abuse of discretion standard of review for evaluating the grant or denial of a motion *in limine*. ***Commonwealth v. Belani***, 101 A.3d 1156, 1160 (Pa.Super. 2014). A trial court has broad discretion to determine whether evidence is admissible, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous. *Id.* If the evidentiary question is purely one of law, the Superior Court's review is plenary. *Id.*

At the time of evaluation, Dr. Weiss was uncertain about whether Mrs. Outterbridge's brother had used drugs and/or died of an overdose. When expert testimony amounts to "mere speculation," meaning that there is no formal offer of proof, it is proper to exclude said testimony altogether. *See* ***Chiorazzi v. Com. Dept. of Highways***, 192 A.2d 400 (Pa. Super. 1963) (citing ***Earl M. Kerstetter, Inc. v. Com. Dept. of Highways***, 171 A.2d 163 (PA. 1961)). Additionally, "expert testimony is incompetent if it lacks adequate basis in fact." ***Gillingham v. Consol Energy, Inc.***, 2012 PA Super 133, 51 A.3d 841 (2012). Courts also look to the substance of expert testimony to determine whether his opinions were based on a reasonable degree of medical certainty rather than upon mere speculation. ***Commonwealth v. Baez***, 720 A.2d 711, 728 (1998).

Dr. Weiss' speculation of *whether* Mrs. Outterbridge's brother used drugs does not amount to an adequate basis in fact that Mrs. Outterbridge's brother was a drug user. Dr. Weiss stated "I did not know the circumstances of her brother's death. [...] So that was taken into account, but we don't know the surrounding circumstances, were there drugs involved, was there substance abuse." Dr. Weiss asserted that he did not know the circumstances of her brother's death, making any testimony surrounding her brother's drug use speculative in nature and therefore properly precluded.

In his fifth issue on appeal, Plaintiff contends that his motion *in limine* to preclude Mr. Outterbridge's continued treatment by Wyncote, filed under control number 23124669, was improperly denied. This Court denied Plaintiff's motion because the amount of time that Mr. Outterbridge spent treating at Wyncote Family Hospital, specifically seeing Dr. Beddis, is relevant to his credibility after he testified in his deposition that he lost confidence in the practice following his wife's death.

As stated previously, Pennsylvania Rule of Evidence 402 provides that, generally, "[a]ll relevant evidence is admissible" and "[e]vidence that is not relevant is not admissible." *Pa.R.E. 402*. Relevant evidence is that which has "any tendency to make a fact more or less probable than it would be without the evidence[,] and the fact is of consequence in determining the action." Pa.R.E. 401(a), (b). Thus, our rules preclude testimony and evidence if it "does not tend to prove or disprove a material fact in issue, or to make such a fact more or less probable, or if it does not afford the basis for a logical or reasonable inference or presumption as to the existence of a material fact in issue." *Commonwealth v. Thompson*, 779 A.2d 1195, 1200–01 (Pa.Super. 2001) (quotation marks, quotation, and citation omitted). *Commonwealth v. Gill*, 2017 PA Super 80, 158 A.3d 719, 725–26 (2017), *judgment rev'd in part, vacated in part*, 651 Pa. 520, 206 A.3d 459 (2019).

Additionally, absent abuse of discretion, it is the sole responsibility of the trial court to determine the probative value of the offer and ensure it is not outweighed by the risk that its admission will create undue prejudice. ***Keough v. Republic Fuel and Burner Co.***, 116 A.2d 671 (Pa. 1961). During trial, Plaintiff argued that he lost faith in Wyncote Family Hospital after his wife's passing but Mr. Outterbridge continued treatment there for *two years* following the *filling of this lawsuit*. As a testifying party, Mr. Outterbridge's credibility is in issue, which is critical to the jury's determination of liability. The fact that Mr. Outterbridge continued treatment with his late wife's primary care doctor is a clear contradiction of his statement that he lost faith in the practice and has great probative value to his mindset or the veracity of his statement. This Court's denial of Plaintiff's motion *in limine* was proper, new trial should not be granted on this issue on appeal.

It is for the aforementioned reasons that this Court respectfully requests the Superior Court affirm its decisions on Plaintiff's issues on appeal.

**BY THE COURT:**

_____ ,J.
ANGELO J. FOGLIETTA

28

## Certificate of Service

On this date, the **12th day of September, 2024**, a true and correct copy of the attached 1925(a)

Opinion was filed by this Court with the Civil Appeals Unit for service upon all attorneys of record

via the Court's electronic filing system.

_____ ,J.

ANGELO J. FOGLIETTA